EXXON CORP. ET AL. *v.* EAGERTON, COMMISSIONER
OF REVENUE OF ALABAMA, ET AL.

No. 81–1020.   Argued February 22, 1983—Decided June 8, 1983*

*Together with No. 81–1268, *Exchange Oil & Gas Corp. et al.* v. *Eagerton, Commissioner of Revenue of Alabama*, also on appeal from the same court.

MARSHALL, J., delivered the opinion for a unanimous Court.

*Rae M. Crowe* argued the cause for appellants in No. 81–1268. With him on the briefs was *Euel A. Screws, Jr.* *C. B. Arendall, Jr.*, argued the cause for appellants in No. 81–1020. With him on the briefs was *Louis E. Braswell.*

*John J. Breckenridge, Jr.*, argued the cause for appellees in both cases. With him on the briefs were *Charles A. Graddick* and *Herbert I. Burson, Jr.*†

JUSTICE MARSHALL delivered the opinion of the Court.

These cases concern an Alabama statute which increased the severance tax on oil and gas extracted from Alabama wells, exempted royalty owners from the tax increase, and prohibited producers from passing on the increase to their purchasers. Appellants challenge the pass-through prohibition and the royalty-owner exemption under the Supremacy Clause, the Contract Clause, and the Equal Protection Clause.

I

Since 1945 Alabama has imposed a severance tax on oil and gas extracted from wells located in the State. Ala. Code § 40–20–1 *et seq.* (1975). The tax "is levied upon the producers of such oil or gas in the proportion of their ownership at the time of severance, but . . . shall be paid by the person in charge of the production operations." § 40–20–3(a).[1] The person in charge of production operations is "authorized, empowered and required to deduct from any amount due to producers of such production at the time of severance the proportionate amount of the tax herein levied before making payments to such producers." § 40–20–3(a). The statute defines a "producer" as "[a]ny person engaging or continuing in the business of oil or gas production," including

"the owning, controlling, managing, or leasing of any oil or gas property or oil or gas well, and producing in any

---

†*Solicitor General Lee, Elliott Schulder, David A. Engels*, and *Jerome M. Feit* filed a brief for the United States et al. as *amici curiae* urging reversal.

[1] The amount of tax that is due and payable constitutes "a first lien upon any of the oil or gas so produced when in the possession of the original producer or any purchaser of such oil or gas in its unmanufactured state or condition." § 40–20–3(a).

manner any oil or gas . . . and . . . receiving money or other valuable consideration as royalty or rental for oil or gas produced. . . ." § 40–20–1(8).

In 1979 the Alabama Legislature enacted Act 79–434, which increased the severance tax from 4% to 6% of the gross value of the oil and gas at the point of production. Whereas the severance tax had previously fallen on royalty owners in proportion to their interests in the oil or gas produced, the amendment specifically exempted royalty owners from the tax increase:

> "Any person who is a royalty owner shall be exempt from the payment of any increase in taxes herein levied and shall not be liable therefor." 1979 Ala. Acts, No. 79–434, p. 687, § 1, as amended, Ala. Code § 40–20–2(d) (1982).

The amendment also prohibited producers from passing the tax increase through to consumers:

> "The privilege tax herein levied shall be absorbed and paid by those persons engaged in the business of producing or severing oil or gas only, and the producer shall not pass on the costs of such tax payments, either directly or indirectly, to the consumer; it being the express intent of this act that the tax herein levied shall be borne exclusively by the producer or severer of oil or gas." 1979 Ala. Acts, No. 79–434, p. 687, § 1(e).

The amendment became effective on September 1, 1979. The pass-through prohibition was repealed on May 28, 1980. 1980 Ala. Acts, No. 80–708, p. 1438.

Appellants in both No. 81–1020 and No. 81–1268 have working interests in producing oil and gas wells located in Alabama.[2] They drill and operate the wells and are responsible for selling the oil and gas extracted. Appellants are obli-

---

[2] Appellants in No. 81–1020 are Exxon Corp., Gulf Oil Corp., and the Louisiana Land and Exploration Co. Appellants in No. 81–1268 are Exchange Oil and Gas Corp., Getty Oil Co., and Union Oil Co. of California.

gated to pay the landowners a percentage of the sale proceeds as royalties, the percentage depending upon the provisions of the applicable lease. Within any given production unit, there may be tracts of land which the owners of the land have leased to nonworking interests, who are also entitled to a share of the sale proceeds. Appellants were parties to contracts providing for the allocation of severance taxes among themselves, the royalty owners, and any nonworking interests in proportion to each party's share of the sale proceeds. Appellants were also parties to sale contracts that required the purchasers to reimburse them for any and all severance taxes on the oil or gas sold.

After paying the 2% increase in the severance tax under protest, appellants and eight other oil and gas producers filed suit in the Circuit Court of Montgomery County, Ala., seeking a declaratory judgment that Act 79–434 was unconstitutional and a refund of the taxes paid under protest. The Circuit Court ruled in favor of appellants, concluding that both the royalty-owner exemption and the pass-through prohibition violate the Equal Protection Clause and the Contract Clause, and that the pass-through prohibition is also preempted by the Natural Gas Policy Act of 1978 (NGPA), 15 U. S. C. § 3301 et seq. (1976 ed., Supp. V). Although Act 79–434 contained a severability clause, the court held the entire Act invalid and ordered appellee Commissioner of Revenue of the State of Alabama to refund the taxes paid under protest. The Supreme Court of Alabama reversed, holding Act 79–434 valid in its entirety. 404 So. 2d 1 (1981).

Appellants appealed to this Court under 28 U. S. C. § 1257(2). We noted probable jurisdiction. 456 U. S. 970 (1982). We now affirm in part, reverse in part, and remand for further proceedings not inconsistent with this opinion.

## II

We deal first with appellants' contention that the application of the pass-through prohibition to gas was pre-empted

by federal law.[3]  The applicable principles of pre-emption were recently summarized in *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n,* 461 U. S. 190, 203–204 (1983):

---

[3] The Supremacy Clause of the Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the contrary notwithstanding." Art. VI, cl. 2.

Although appellants in No. 81–1268 also contend that the application of the pass-through prohibition to oil was pre-empted by the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U. S. C. § 751 *et seq.* (1976 ed. and Supp. V), and the regulations promulgated thereunder, we conclude that we have no jurisdiction to consider this contention.  The decision below does not discuss this issue, and when " 'the highest state court has failed to pass upon a federal question, it will be assumed that the omission was due to want of proper presentation in the state courts, unless the aggrieved party in this Court can affirmatively show the contrary.' "  *Fuller v. Oregon,* 417 U. S. 40, 50, n. 11 (1974), quoting *Street v. New York,* 394 U. S. 576, 582 (1969).  No such showing has been made here.  Although appellants in No. 81–1268 have represented to this Court that the trial court held the pass-through prohibition to be pre-empted by the EPAA, Juris. Statement 3, an examination of the trial court opinion reveals that in fact the court made no mention of the EPAA.  Nor does anything in the record before us indicate that this issue was raised in the trial court.  Appellants did address the EPAA in their brief before the Supreme Court of Alabama, Brief for Appellees Exchange Oil and Gas Corp., Getty Oil Co., Placid Oil Co., Union Oil Co. of California in No. 79–823, pp. 51–53, but that court did not pass on the issue.  Under these circumstances we have no jurisdiction to consider whether the EPAA pre-empted the application of the pass-through prohibition to oil, for it does not affirmatively appear that that issue was decided below.  *Bailey v. Anderson,* 326 U. S. 203, 206–207 (1945).  The general practice of the Alabama appellate courts is not to consider issues raised for the first time on appeal.  See, *e. g., State v. Newberry,* 336 So. 2d 181, 182 (Ala. 1976); *State v. Graf,* 280 Ala. 71, 72, 189 So. 2d 912, 913 (1966); *Burton v. Burton,* 379 So. 2d 617, 618 (Civ. App. 1980); *Crews v. Houston County Dept. of Pensions & Security,* 358 So. 2d 451, 455 (Civ. App.), cert. denied, 358 So. 2d 456 (Ala. 1978).

Appellants in No. 81–1268 have also burdened this Court with a labored argument that they were denied due process by the Supreme Court of Alabama's refusal to consider the legislative history of the 1979 amendments

"Absent explicit pre-emptive language, Congress' intent to supersede state law altogether may be found from a '"scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose."' *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta,* 458 U. S. 141, 153 (1982), quoting *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947). Even where Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with federal law. Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 142–143 (1963), or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941)."

Appellants contend that the pass-through prohibition was in conflict with § 110(a) of the NGPA, 92 Stat. 3368, 15 U. S. C. § 3320(a) (1976 ed., Supp. V), which provides in pertinent part as follows:

"[A] price for the first sale of natural gas shall not be considered to exceed the maximum lawful price appli-

---

to the state severance tax, a history which, according to appellants, shows that those amendments were intended to apply only to certain wells located in one county in the State and not to apply statewide. Suffice it to say that the weight to be given to the legislative history of an Alabama statute is a matter of Alabama law to be determined by the Supreme Court of Alabama.

cable to the first sale of such natural gas under this part if such first sale price exceeds the maximum lawful price to the extent necessary to recover—

"(1) State severance taxes attributable to the production of such natural gas and borne by the seller . . . ."

We agree with the Supreme Court of Alabama[4] that the pass-through prohibition did not conflict with this provision. On its face § 110(a) of the NGPA does not give any seller the affirmative right to include in his price an amount necessary

---

[4] See 404 So. 2d, at 6:

"Nowhere in that section [§ 110(a) of the NGPA] is it stated that the oil companies are entitled to 'pass-through' increases on state severance taxes. Rather, the Act merely provides that the lawful ceiling on the first sale at the wellhead may be raised if a severance tax is imposed by the states. The two Acts are aimed at entirely different purposes. In other words, although it would be perfectly permissible for the oil and gas companies to raise the price for the first sale of natural gas, subject to the limitations of the Natural Gas Policy Act, all that Act No. 79–434 requires is that the increase in severance tax mandated by that Act be borne by the producer or severer of the oil or gas."

Relying on this passage, appellee Commissioner of Revenue contends that the pass-through prohibition did not bar a producer from increasing its price by an amount equal to the increase in the severance tax, provided that the producer did not label that increase a tax:

"The Commissioner believes that the seller may include in the lawful maximum price an amount equal to Alabama's severance taxes borne by the seller resulting from the production of natural gas. The Commissioner believes that it was the intent of the Alabama Legislature in adopting the pass-through prohibition that it did not want to be perceived as levying an additional tax on the consumer. Therefore it prohibited anyone from passing along the increase levied by Act 79–434 *as a tax*." Brief for Appellee Eagerton 16–17 (emphasis in original).

We do not agree with appellee that the Supreme Court of Alabama interpreted the pass-through prohibition to leave sellers free to pass through the tax increase so long as they did not tell their customers that that is what they were doing. The statute contains no language that would suggest this limitation, and as we understand the opinion below, the point of the passage relied upon by appellee was only that the pass-through prohibition did not conflict with federal law.

to recover state severance taxes. It simply provides that a seller who does include such an amount in his price shall not be deemed to have exceeded the federal price ceiling if he would not have exceeded it had that amount not been included. Nothing in the legislative history of the NGPA has been called to our attention to indicate that § 110(a) was intended to have a greater effect than its language would indicate.[5]

Although the pass-through prohibition thus was not in conflict with § 110(a) of the NGPA, we nevertheless conclude that it was pre-empted by federal law insofar as it applied to sales of gas in interstate commerce. To that extent, the pass-through prohibition represented an attempt to legislate in a field that Congress has chosen to occupy. The Natural Gas Act (Gas Act), 52 Stat. 821, as amended, 15 U. S. C. §§ 717–717w (1976 ed. and Supp. V), was enacted in 1938 "to provide the Federal Power Commission, now the FERC, with authority to regulate the wholesale pricing of natural gas in the flow of interstate commerce from wellhead to delivery to consumers." *Maryland* v. *Louisiana*, 451 U. S. 725, 748 (1981). As we have previously recognized, *e. g.*, *Phillips Petroleum Co.* v. *Wisconsin*, 347 U. S. 672, 682–683 (1954); *id.*, at 685–687 (Frankfurter, J., concurring), the Gas Act was intended to occupy the field of wholesale sales of natural gas in interstate commerce, a field which had previously been left largely unregulated as a result of the absence of federal action and decisions of this Court striking down state regulation of sales of natural gas in interstate commerce. The Committee Reports on the bill that became the Gas Act clearly evidence this intent:

> "[S]ales for resale, or so-called wholesale sales, in interstate commerce (for example, sales by producing compa-

---

[5] Although the United States and the Federal Energy Regulatory Commission (FERC) in their *amicus* brief point to the statement in the Conference Report that "[a]ll ceiling prices under this Act are exclusive of

nies to distributing companies) . . . have been considered to be not local in character and, even in the absence of Congressional action, not subject to State regulation. *The basic purpose of the present legislation is to occupy this field in which the Supreme Court has held that the States may not act."* H. R. Rep. No. 709, 75th Cong., 1st Sess., 1–2 (1937); S. Rep. No. 1162, 75th Cong., 1st Sess., 2 (1937) (citations omitted) (emphasis added).

The Alabama pass-through prohibition trespassed upon FERC's authority over wholesale sales of gas in interstate commerce, for it barred gas producers from increasing their prices to pass on a particular expense—the increase in the severance tax—to their purchasers. Whether or not producers should be permitted to recover this expense from their purchasers is a matter within the sphere of FERC's regulatory authority. See *FPC* v. *United Gas Pipe Line Co.*, 386 U. S. 237, 243 (1967) (emphasis added):

"One of [the FPC's] statutory duties is to determine just and reasonable rates which will be sufficient to permit the company to recover its costs of service and a reasonable return on its investment. Cost of service is therefore a major focus of inquiry. *Normally included as a cost of service is a proper allowance for taxes . . . ."*

Here, as in *Maryland* v. *Louisiana*, the state statute "interfere[d] with the FERC's authority to regulate the determination of the proper allocation of costs associated with the sale of natural gas to consumers." 451 U. S., at 749. Just as the statute at issue in *Maryland* v. *Louisiana* was preempted because it effectively "shift[ed] the incidence of certain expenses . . . to the ultimate consumer of the processed gas without the prior approval of the FERC," *id.*, at 750, Alabama's pass-through prohibition was pre-empted, insofar as

State severance taxes borne by the seller . . . ," H. R. Conf. Rep. No. 95–1752, p. 90 (1978), we do not see how this statement supports their position that the pass-through prohibition was in conflict with § 110(a).

it applied to sales of gas in interstate commerce, because it required that certain expenses be absorbed by producers.

We reach a different conclusion with respect to the application of the pass-through prohibition to sales of gas in intrastate commerce.[6]  Although § 105(a) of the NGPA extended federal authority to control prices to the intrastate market, 15 U. S. C. § 3315(a) (1976 ed., Supp. V), Congress also provided that this extension of federal authority did not deprive the States of the power to establish a price ceiling for intrastate producer sales of gas at a level lower than the federal ceiling.  Section 602(a) of the NGPA, 92 Stat. 3411, as set forth in 15 U. S. C. § 3432(a) (1976 ed., Supp. V), states that

> "[n]othing in this chapter shall affect the authority of any State to establish or enforce any maximum lawful price for the first sale of natural gas produced in such State which does not exceed the applicable maximum lawful price, if any, under subchapter I of this chapter."

See *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U. S. 400, 420–421 (1983) (in enacting the NGPA, "Congress explicitly envisioned that the States would regulate intrastate markets in accordance with the overall national policy").

Since a State may establish a lower price ceiling, we think it may also impose a severance tax and forbid sellers to pass it through to their purchasers.  For sellers charging the

---

[6] The parties stipulated that a substantial portion of the gas extracted by appellants was sold in interstate commerce.  App. in No. 81–1020, pp. 78, 184–185.  Because the trial court concluded that the pass-through prohibition was in conflict with § 110(a) of the NGPA, it did not determine how much of the taxes at issue in this case were levied on gas sold in intrastate and interstate commerce.  If, on remand, when the Supreme Court of Alabama inquires into the question of severability, see *infra*, at 196–197, that court holds that the Alabama Legislature would have intended to impose the tax increase on the severance of gas if and only if the increase could not be passed through to consumers when the gas is sold, such a determination may have to be made.

maximum price allowed by federal law, a state tax increase coupled with a pass-through prohibition will not differ in practical effect from a state tax increase coupled with the imposition of a state price ceiling that maintains the price ceiling imposed by federal law prior to the tax increase. In both cases sellers are required to absorb expenses that they might be able to pass through to their customers absent the state restrictions. Given the absence of any express pre-emption provision in the NGPA and Congress' express approval of one form of state regulation, we do not think it can fairly be inferred that Congress contemplated that the general scheme created by the NGPA would preclude another form of state regulation that is no more intrusive.[7]

We conclude that the pass-through prohibition was pre-empted by federal law insofar as it applied to sales of gas in interstate commerce, but not insofar as it applied to producer sales of gas in intrastate commerce.

## III

We turn next to appellants' contention that the royalty-owner exemption and the pass-through prohibition impaired the obligations of contracts in violation of the Contract Clause.[8]

### A

Appellants' Contract Clause challenge to the royalty-owner exemption fails for the simple reason that there is nothing to suggest that that exemption nullified any contrac-

---

[7] We note that these cases do not involve any attempt by a State to prohibit gas producers from passing through the cost of a factor of production such as labor or machinery. Such a prohibition might raise additional considerations not present here because of the inducement it would create for producers to shift away from the factor of production to which the pass-through prohibition applied.

[8] The Contract Clause provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U. S. Const., Art. I, § 10, cl. 1.

tual obligations of which appellants were the beneficiaries.[9]
The relevant provision of Act 79–434 states that "[a]ny per-
son who is a royalty owner shall be exempt from the payment
of any increase in taxes levied and shall not be liable there-
for."  On its face this portion of the Act provides only that
the legal incidence of the tax increase does not fall on royalty

---

[9] The contracts into which appellants had entered appear to entitle them
to reimbursement from the royalty owners for a share of any severance tax
paid by appellants in proportion to the royalty owners' interest in the oil or
gas, regardless of whether state law imposes that tax on the producer or on
the royalty owner.  Appellants cite the following contractual provisions as
typical of the agreements which they contend are impaired by the royalty-
owner exemption:

"Lessor shall bear and pay, and there shall be deducted from the royalties
due hereunder, Lessor's proportionate royalty share of:

"(a) All applicable severance, production and other such taxes levied or im-
posed upon production from the leased premises."  App. in No. 81–1020,
pp. 76–77.

"LESSOR AND LESSEE shall bear in proportion to their respective par-
ticipation in the production hereunder, all taxes levied on minerals covered
hereby or any part thereof, or on the severance or production thereof, and
all increases . . . in taxes on the lease premises or any part thereof."  Id.,
at 184.

These provisions would seem to entitle appellants to recover from the roy-
alty owners a portion of the tax increase in proportion to the royalty own-
ers' interests in the proceeds of the oil or gas sold by appellants, regardless
of the legal incidence of the tax increase.

Even if these contractual provisions were to be interpreted to entitle ap-
pellants to reimbursement only for that portion of the severance tax which
state law itself imposes on the royalty owners, appellants would still have
no objection under the Contract Clause.  In that event, the increase in the
severance tax would be absorbed by appellants not because the State has
nullified any contractual obligation, but simply because the provisions as so
interpreted would impose no obligation on the royalty owners to reimburse
appellants for the tax increase.

Since appellants have not shown that the royalty-owner exemption af-
fects anything other than the legal incidence of the tax increase, their con-
tention that the exemption is pre-empted by the Gas Act and the NGPA is
plainly without merit.

owners, *i. e.*, the State cannot look to them for payment of the additional taxes. In contrast to the pass-through prohibition, the royalty-owner exemption nowhere states that producers may not shift the burden of the tax increase in whole or in part to royalty owners. Nor is there anything in the opinion below to suggest that the Supreme Court of Alabama interpreted the exemption to have this effect. We will not strain to reach a constitutional question by speculating that the Alabama courts might in the future interpret the royalty-owner exemption to forbid enforcement of a contractual arrangement to shift the burden of the tax increase. See *Ashwander* v. *TVA*, 297 U. S. 288, 346–347 (1936) (Brandeis, J., concurring).

## B

Unlike the royalty-owner exemption, the pass-through prohibition did restrict contractual obligations of which appellants were the beneficiaries. Appellants were parties to sale contracts that permitted them to include in their prices any increase in the severance taxes that they were required to pay on the oil or gas being sold.[10] The contracts were entered into before the pass-through prohibition was enacted and their terms extended through the period during which the prohibition was in effect. By barring appellants from passing the tax increase through to their purchasers, the pass-through prohibition nullified *pro tanto* the purchasers' contractual obligations to reimburse appellants for any severance taxes.

While the pass-through prohibition thus affects contractual obligations of which appellants were the beneficiaries, it does not follow that the prohibition constituted a "Law impairing the Obligations of Contracts" within the meaning of the Con-

---

[10] For example, appellant Union Oil Co. was a party to a contract concerning oil under which the purchaser was required to reimburse it for "100 percent of the amount by which any severance taxes paid by seller are in excess of the rates of such taxes levied as of April 1, 1976." *Ibid.*

tract Clause.  See *United States Trust Co.* v. *New Jersey*, 431 U. S. 1, 21 (1977).  "Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'"  *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U. S., at 410, quoting *Home Bldg. & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 434 (1934).  This Court has long recognized that a statute does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment.  See *Allied Structural Steel Co.* v. *Spannaus*, 438 U. S. 234, 241–242 (1978).  If the law were otherwise, "one would be able to obtain immunity from state regulation by making private contractual arrangements."  *United States Trust Co.* v. *New Jersey, supra,* at 22.

The Contract Clause does not deprive the States of their "broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result."  *United States Trust Co.* v. *New Jersey, supra,* at 22.  As Justice Holmes put it: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.  The contract will carry with it the infirmity of the subject matter."  *Hudson Co.* v. *McCarter*, 209 U. S. 349, 357 (1908).[11]  Thus, a state prohi-

---

[11] This point was aptly stated in an early decision holding that a statute prohibiting the issuance of notes by unincorporated banking associations did not violate the Contract Clause by preventing the performance of existing contracts entered into by members of such associations:

"[I]t is said that the members had formed a contract *between themselves*, which would be dissolved by the stoppage of their business.  And what then?  Is that such a violation of contracts as is prohibited by the constitution of the *United States?*  Consider to what such a construction would lead.  Let us suppose, that in one of the states there is no law against gaming, cock-fighting, horse-racing, or public masquerades, and that compa-

bition law may be applied to contracts for the sale of beer that were valid when entered into, *Beer Co.* v. *Massachusetts*, 97 U. S. 25 (1878), a law barring lotteries may be applied to lottery tickets that were valid when issued, *Stone* v. *Mississippi*, 101 U. S. 814 (1880), and a workmen's compensation law may be applied to employers and employees operating under pre-existing contracts of employment that made no provision for work-related injuries, *New York Central R. Co.* v. *White*, 243 U. S. 188 (1917).[12]

Like the laws upheld in these cases, the pass-through prohibition did not prescribe a rule limited in effect to contractual obligations or remedies, but instead imposed a generally applicable rule of conduct designed to advance "a broad societal interest," *Allied Structural Steel Co.*, *supra*, at 249: protecting consumers from excessive prices. The prohibition applied to all oil and gas producers, regardless of whether they happened to be parties to sale contracts that contained a provision permitting them to pass tax increases through to their purchasers. The effect of the pass-through prohibition

nies should be formed for the purpose of carrying on these practices. And suppose, that the legislature of that state, being [seriously] convinced of the pernicious effect of these institutions, should venture to interdict them: will it be seriously contended, that the constitution of the *United States* has been violated?" *Myers* v. *Irwin*, 2 Serg. & Rawle 368, 372 (Pa. 1816).

[12] See generally *Home Bldg. & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 436–437 (1934); *id.*, at 475–477 (Sutherland, J., dissenting); *Dillingham* v. *McLaughlin*, 264 U. S. 370, 374 (1924) ("The operation of reasonable laws for the protection of the public cannot be headed off by making contracts reaching into the future") (Holmes, J.); *Manigault* v. *Springs*, 199 U. S. 473, 480 (1905) ("parties by entering into contracts may not estop the legislature from enacting laws intended for the public good"); *Ogden* v. *Saunders*, 12 Wheat. 213, 291 (1827) (when "laws are passed rendering that unlawful, even incidentally, which was lawful at the time of the contract[,] it is the government that puts an end to the contract, and yet no one ever imagined that it thereby violates the obligation of a contract"); Hale, The Supreme Court and the Contract Clause: II, 57 Harv. L. Rev. 621, 671–674 (1944).

on existing contracts that did contain such a provision was incidental to its main effect of shielding consumers from the burden of the tax increase. Cf. *Henderson Co.* v. *Thompson*, 300 U. S. 258, 266 (1937); *Beer Co.* v. *Massachusetts*, *supra*, at 32.

Because the pass-through prohibition imposed a generally applicable rule of conduct, it is sharply distinguishable from the measures struck down in *United States Trust Co.* v. *New Jersey, supra,* and *Allied Structural Steel Co.* v. *Spannaus, supra.* *United States Trust Co.* involved New York and New Jersey statutes whose sole effect was to repeal a covenant that the two States had entered into with the holders of bonds issued by The Port Authority of New York and New Jersey.[13] Similarly, the statute at issue in *Allied Structural Steel Co.* directly " 'adjust[ed] the rights and responsibilities of contracting parties.' " 438 U. S., at 244, quoting *United States Trust Co.* v. *New Jersey, supra,* at 22. The statute required a private employer that had contracted with its employees to provide pension benefits to pay additional benefits, beyond those it had agreed to provide, if it terminated the pension plan or closed a Minnesota office. Since the statute applied only to employers that had entered into pension agreements, its sole effect was to alter contractual duties. Cf. *Worthen Co.* v. *Kavanaugh*, 295 U. S. 56 (1935) (statute which drastically limited the remedies available to mortgagees held invalid under the Contract Clause).

Alabama's power to prohibit oil and gas producers from passing the increase in the severance tax on to their purchasers is confirmed by several decisions of this Court rejecting Contract Clause challenges to state rate-setting schemes that displaced any rates previously established by contract. In

---

[13] The statutes under review in *United States Trust Co.* also implicated the special concerns associated with a State's impairment of its own contractual obligations. See 431 U. S., at 25–28; *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U. S. 400, 412–413, and n. 14 (1983).

*Midland Realty Co.* v. *Kansas City Power & Light Co.*, 300 U. S. 109 (1937), it was held that a party to a long-term contract with a utility could not invoke the Contract Clause to obtain immunity from a state public service commission's imposition of a rate for steam heating that was higher than the rate established in the contract. The Court declared that "the State has power to annul and supersede rates previously established by contract between utilities and their customers." *Id.*, at 113 (footnote omitted). In *Union Dry Goods Co.* v. *Georgia Public Service Corp.*, 248 U. S. 372 (1919), the Court rejected a Contract Clause challenge to an order of a state commission setting the rates that could be charged for supplying electric light and power, notwithstanding the effect of the order on pre-existing contracts. Accord, *Stephenson* v. *Binford*, 287 U. S. 251 (1932) (upholding law which barred private contract carriers from using the highways unless they charged rates which might exceed those they had contracted to charge).

*Producers Transportation Co.* v. *Railroad Comm'n of California*, 251 U. S. 228 (1920), is particularly instructive for present purposes. In that case the Court upheld an order issued by a state commission under a newly enacted statute empowering the commission to set the rates that could be charged by individuals or corporations offering to transport oil by pipeline. The Court rejected the contention of a pipeline owner that the statute could not override pre-existing contracts:

> "That some of the contracts . . . were entered into before the statute was adopted or the order made is not material. A common carrier cannot by making contracts for future transportation or by mortgaging its property or pledging its income prevent or postpone the exertion by the State of the power to regulate the carrier's rates and practices. Nor does the contract clause of the Constitution interpose any obstacle to the exertion of that power." *Id.*, at 232.

There is no material difference between *Producers Transportation Co.* and the cases before us. If a party that has entered into a contract to transport oil is not immune from subsequently enacted state regulation of the rates that may be charged for such transportation, parties that have entered into contracts to sell oil and gas likewise are not immune from state regulation of the prices that may be charged for those commodities. And if the Contract Clause does not prevent a State from dictating the price that sellers may charge their customers, plainly it does not prevent a State from requiring that sellers absorb a tax increase themselves rather than pass it through to their customers. If one form of state regulation is permissible under the Contract Clause notwithstanding its incidental effect on pre-existing contracts, the other form of regulation must be permissible as well.[14]

---

[14] Our conclusion is buttressed by the fact that appellants operate in industries that have been subject to heavy regulation. See *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, *supra*, at 416 ("Price regulation existed and was foreseeable as the type of law that would alter contract obligations"); *Veix* v. *Sixth Ward Bldg. & Loan Assn.*, 310 U. S. 32, 38 (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic").

With respect to gas, see *supra*, at 184–186; *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, *supra*, at 413–416. During the time the pass-through prohibition was in effect, the Federal Government controlled the prices of crude oil under the EPAA, 15 U. S. C. § 751 *et seq.* (1976 ed. and Supp. V). Regulations promulgated under the EPAA established maximum prices for most categories of crude oil. 10 CFR Part 212, Subpart D—Producers of Crude Petroleum, § 212.71 *et seq.* (1975).

Appellants' reliance on *Barwise* v. *Sheppard*, 299 U. S. 33 (1936), is misplaced. In *Barwise* the owners of royalty interests challenged a Texas statute that imposed a new tax on oil production, which was to be borne "ratably by all interested parties including royalty interests." The statute authorized the producers to pay the tax and withhold from any royalty owners their proportionate share of the tax. The royalty owners in *Barwise* were parties to contracts that entitled them to specified shares of the oil produced by their lessee and required the lessee to deliver the oil

## IV

Finally, we reject appellants' equal protection challenge to the pass-through prohibition and the royalty-owner exemption. Because neither of the challenged provisions adversely affects a fundamental interest, see, *e. g., Dunn* v. *Blumstein,* 405 U. S. 330, 336–342 (1972); *Shapiro* v. *Thompson,* 394 U. S. 618, 629–631 (1969), or contains a classification based upon a suspect criterion, see, *e. g., Graham* v. *Richardson,* 403 U. S. 365, 372 (1971); *McLaughlin* v. *Florida,* 379 U. S. 184, 191–192 (1964), they need only be tested under the lenient standard of rationality that this Court has traditionally applied in considering equal protection challenges to

---

"free of cost." *Id.,* at 35. They contended that the statute, by authorizing the lessee to deduct their portion of the tax from any payments due them, impermissibly impaired the lessee's obligation to deliver the oil "free of cost." This Court concluded that the statute did not run afoul of the Contract Clause:

"[T]he lease was made in subordination to the power of the State to tax the production of oil and to apportion the tax between the lessors and the lessee. . . . Plainly no stipulation in the lease can be of any avail as against the power of the State to impose the tax, prescribe who shall be under a duty to the State to pay it, and fix the time and mode of payment. And this is true even though it be assumed to be admissible for the lessors and lessee to stipulate as to who, as between themselves, shall ultimately bear the tax." *Id.,* at 40.

We reject appellants' assertion that the last sentence of this quotation was meant to indicate that the statute would have violated the Contract Clause if, instead of simply specifying the legal incidence of the tax, it had nullified an agreement as to who would ultimately bear the burden of the tax. We think the thrust of the sentence was simply that even though the law left the lessors and the lessee free to allocate the ultimate burden of the tax as they saw fit, no agreement between them could limit the State's power to decide who must pay the tax and to specify the time and manner of payment.

*Barwise* is relevant to these cases only insofar as it confirms Alabama's power to decide that no part of the legal incidence of the increase in the severance tax would fall on owners of royalty interests. See Part III–A, *supra.*

regulation of economic and commercial matters. See, *e. g.*, *Western & Southern Life Ins. Co.* v. *State Board of Equalization*, 451 U. S. 648, 668 (1981); *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 461–463 (1981); *Kotch* v. *Board of River Pilot Comm'rs*, 330 U. S. 552, 564 (1947). Under that standard a statute will be sustained if the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose. See, *e. g.*, *Western & Southern Life Ins. Co., supra,* at 668; *Clover Leaf Creamery Co., supra,* at 461–462, 464.

We conclude that the measures at issue here pass muster under this standard. The pass-through prohibition plainly bore a rational relationship to the State's legitimate purpose of protecting consumers from excessive prices. Similarly, we think the Alabama Legislature could have reasonably determined that the royalty-owner exemption would encourage investment in oil or gas production. Our conclusion with respect to the royalty-owner exemption is reinforced by the fact that that provision is solely a tax measure. As we recently stated in *Regan* v. *Taxation with Representation of Washington*, 461 U. S. 540, 547 (1983), "[l]egislatures have especially broad latitude in creating classifications and distinctions in tax statutes." See *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U. S. 356, 359 (1973); *Allied Stores of Ohio* v. *Bowers*, 358 U. S. 522, 526–527 (1959).

## V

For the foregoing reasons, we conclude that the application of the pass-through prohibition to sales of gas in interstate commerce was pre-empted by federal law, but we uphold both the pass-through prohibition and the royalty-owner exemption against appellants' challenges under the Contract Clause and the Equal Protection Clause. Since the severability of the pass-through prohibition from the remainder

of the 1979 amendments is a matter of state law, we remand to the Supreme Court of Alabama for that court to determine whether the partial invalidity of the pass-through prohibition entitles appellants to a refund of some or all of the taxes paid under protest. See n. 6, *supra*. Accordingly, the judgment of the Supreme Court of Alabama is affirmed in part and reversed in part, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*