SHEPHERD, Circuit Judge, dissenting.
 

 I respectfully disagree with the Court's conclusion that North Dakota has not met its burden of showing a significant and legitimate public purpose underlying SB 2289. Because this Court has stated that a state's interest in serving its farming and rural communities is "unquestionably significant and legitimate,"
 
 Equip. Mfrs. Inst. v. Janklow
 
 ,
 
 300 F.3d 842
 
 , 860 (8th Cir. 2002), and SB 2289 sufficiently evinces
 such a public purpose, I respectfully dissent.
 

 Generally, "the Contract Clause does not prohibit the States from repealing or amending statutes ... , or from enacting legislation with retroactive effects."
 
 U.S. Trust Co. of N.Y. v. New Jersey
 
 ,
 
 431 U.S. 1
 
 , 17,
 
 97 S.Ct. 1505
 
 ,
 
 52 L.Ed.2d 92
 
 (1977). A state's exercise of its police power "to protect the lives, health, morals, comfort and general welfare of the people ... is paramount to any rights under contracts between individuals."
 
 Allied Structural Steel Co. v. Spannaus
 
 ,
 
 438 U.S. 234
 
 , 241,
 
 98 S.Ct. 2716
 
 ,
 
 57 L.Ed.2d 727
 
 (1978) (internal quotation marks omitted). It is essential for a state to retain its police power to enact legislation aimed at addressing perceived economic harms "without being concerned that private contracts will be impaired, or even destroyed, as a result. Otherwise, one would be able to obtain immunity from the [legislation] by making private contractual arrangements."
 
 U.S. Trust
 
 ,
 
 431 U.S. at 22
 
 ,
 
 97 S.Ct. 1505
 
 . However, state legislation's "sole effect" cannot be "to alter contractual duties."
 
 Exxon Corp. v. Eagerton
 
 ,
 
 462 U.S. 176
 
 , 192,
 
 103 S.Ct. 2296
 
 ,
 
 76 L.Ed.2d 497
 
 (1983) ;
 
 see also
 

 City of El Paso v. Simmons
 
 ,
 
 379 U.S. 497
 
 , 509,
 
 85 S.Ct. 577
 
 ,
 
 13 L.Ed.2d 446
 
 (1965) (noting that "[i]t is the motive, the policy, the object, that must characterize the legislative act, to affect it with the imputation of violating the obligation of contracts" (alteration in original) (citation omitted)).
 

 Although SB 2289 substantially impairs preexisting contractual obligations between farm implement dealers and farm equipment manufacturers, such an impairment is not fatal where the state shows it has "a significant and legitimate public purpose" for the impairment.
 
 Energy Reserves Grp., Inc. v. Kan. Power & Light Co.
 
 ,
 
 459 U.S. 400
 
 , 411,
 
 103 S.Ct. 697
 
 ,
 
 74 L.Ed.2d 569
 
 (1983) ;
 
 Equip. Mfrs. Inst.
 
 ,
 
 300 F.3d at 859-60
 
 . State legislation that substantially impairs preexisting contracts between private parties must be "enacted to protect a broad societal interest rather than a narrow class."
 
 Allied Structural
 
 ,
 
 438 U.S. at 249
 
 ,
 
 98 S.Ct. 2716
 
 . The legislation must be "addressed to a legitimate end[.]"
 
 Home Bldg. & Loan Ass'n v. Blaisdell
 
 ,
 
 290 U.S. 398
 
 , 438,
 
 54 S.Ct. 231
 
 ,
 
 78 L.Ed. 413
 
 (1934). This is not a difficult burden for a state to meet. A state's "economic interests ... may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts. ... Once we are in this domain of the reserve power of a State we must respect the wide discretion on the part of the legislature in determining what is and what is not necessary."
 
 City of El Paso
 
 ,
 
 379 U.S. at 508-09
 
 ,
 
 85 S.Ct. 577
 
 (citation omitted) (internal quotation marks omitted). In other words, "courts ordinarily will not interfere with" the legislature's wide discretion in this area.
 
 Manigault v. Springs
 
 ,
 
 199 U.S. 473
 
 , 480-81,
 
 26 S.Ct. 127
 
 ,
 
 50 L.Ed. 274
 
 (1905).
 
 [3]
 
 Requiring a significant
 and legitimate public purpose for substantially impairing preexisting contractual rights between private parties simply "guarantees that the State is exercising its police power, rather than providing a benefit to special interests."
 
 Energy Reserves
 
 ,
 
 459 U.S. at 412
 
 ,
 
 103 S.Ct. 697
 
 .
 

 The Court today employs an approach that second-guesses the North Dakota legislature's sound judgment and unnecessarily heightens the state's burden. The Court faults the legislature for not including "well-supported findings or purposes within" SB 2289 and finds the legislators' statements in the official legislative record to be "insufficient."
 
 Supra
 
 , at 733. I respectfully disagree. In enacting SB 2289, the legislature was pursuing a broad societal interest.
 

 First
 
 , in enacting legislation, the North Dakota legislature is presumed to have acted in favor of the "[p]ublic interest ... over any private interest."
 
 N.D. Cent. Code § 1-02-38
 
 (5). Undoubtedly, the legislature believed SB 2289 benefitted the public; the legislation enjoyed overwhelming support in both chambers. The North Dakota Senate passed SB 2289 with a vote margin of 46-0, S. Journal, 65th Legis. Assemb., Reg. Sess. 434 (N.D. 2017), and the North Dakota House of Representatives passed SB 2289 with a vote margin of 86-5. H. Journal, 65th Legis. Assemb., Reg. Sess. 942 (N.D. 2017).
 

 Second
 
 , the title of SB 2289 suggests that the legislation is not solely designed to alter preexisting contracts between private parties.
 
 Compare
 
 S.B. 2289, 65th Legis. Assemb., Reg. Sess. (N.D. 2017) ("An Act to amend and reenact sections 51-07-01.2, 51-07-02.2, and 51-26-06 of the North Dakota Century Code, relating to prohibited practices under farm equipment dealership contracts, dealership transfers, and reimbursement for warranty repair."),
 
 with
 

 Equip. Mfrs. Inst.
 
 ,
 
 300 F.3d at 861
 
 (concluding that there was no significant and legitimate public purpose in South Dakota legislation titled "An Act to provide certain restrictions for dealership contracts for machinery").
 

 Third
 
 , although the text of SB 2289 covers dealers and manufacturers and is silent over any benefits for North Dakota's farming and rural communities, that is not fatal. Neither the North Dakota Constitution nor the North Dakota Century Code expressly require that legislation contain either a statement of legislative purpose or legislative findings.
 
 Cf.
 

 Allied Stores of Ohio, Inc. v. Bowers
 
 ,
 
 358 U.S. 522
 
 , 528,
 
 79 S.Ct. 437
 
 ,
 
 3 L.Ed.2d 480
 
 (1959) (noting that, in the Equal Protection Clause context, "a state legislature need not explicitly declare its purpose" for enacting legislation). Nor does the absence of express text establish that the North Dakota legislature was acting in bad faith. In a Contract Clause challenge, legislative history may be used to ascertain the purpose underlying the legislation at issue.
 
 Equip. Mfrs. Inst.
 
 ,
 
 300 F.3d at
 
 860 ;
 
 Deere & Co. v. State
 
 ,
 
 168 N.H. 460
 
 ,
 
 130 A.3d 1197
 
 , 1211 (2015). North Dakota permits the use of legislative history in the absence of legislative findings "to determine the evils and objectives at which the legislation was aimed as distinguished from the meaning of the statute."
 
 State v. Knoefler
 
 ,
 
 279 N.W.2d 658
 
 , 663-64 (N.D. 1979) (relying on state legislature's house and senate agriculture committees' minutes to ascertain the primary purpose of the legislation).
 

 The legislative history underlying SB 2289 reveals that the legislation was designed
 to accomplish more than one purpose: not only to regulate relationships between dealers and manufacturers, but also to serve the farming and rural communities in North Dakota. North Dakota House Representative Craig Headland stated "that [the loss of farm equipment dealers] would have an impact on the town where the dealer is located." House Agriculture Committee Vice-Chairman Representative Wayne A. Trottier stated that, if farmers cannot "get service and sales, it makes it costlier and more difficult." Representative Dwight Kiefert stated that equipment is purchased "because we can get the service and the parts. Our area dealership closed and it costs more to get service because there is more mileage." Representative Kiefert further stated that "[t]here was a time when things were easy to fix. Now we are dependent to have the dealer come out." And House Agriculture Committee Chairman Representative Dennis Johnson stated that, "[a]s a custom harvestor over the years[,]" he had
 

 seen from Oklahoma the dealerships that have closed in 25 years. At the end of the day we all need each other. We are still sitting with $4 wheat. We are heading for a train wreck in trying to make this all work. We want to take care of everyone involved: farmers, dealers, and manufacturers.
 

 SB 2289 aspires to benefit the farming and rural communities of North Dakota as well as the dealers that do business there. The legislation aims to preserve the symbiotic relationship between the groups. Farmers rely on having a local dealer for prompt service, especially during harvest. Without a local dealer, farmers must travel farther to purchase equipment and obtain repairs. Moreover, the small towns in North Dakota with dealerships reasonably depend on the employment opportunities that come with having such dealerships. Depriving North Dakotans of these opportunities results in adverse consequences for the communities where the dealers are located.
 

 The Court states that, "[e]ven if [SB 2289] indirectly might benefit farmers and rural communities, the Contract Clause demands more than incidental public benefits."
 
 Supra
 
 , at 733. However, the Contract Clause makes no such demand and, if anything, the Court's statement acknowledges that SB 2289 does not exclusively benefit dealers.
 

 The Contract Clause requires that state legislation be "enacted to protect a broad societal interest rather than a narrow class."
 
 Allied Structural
 
 ,
 
 438 U.S. at 249
 
 ,
 
 98 S.Ct. 2716
 
 . Here, SB 2289 aspires to benefit a broad class: the farming and rural communities of North Dakota as well as the dealers that do business there. It is simply irrelevant whether the benefits to that broad class are incidental. Other than prohibiting state legislation exclusively designed to alter contractual duties, the Contract Clause places no limitations on a state's ability to exercise its police power "to protect the lives, health, morals, comfort and general welfare of the people,"
 

 id.
 

 at 241
 
 ,
 
 98 S.Ct. 2716
 
 (internal quotation marks omitted), much less the manner in which a state chooses to implement that power. The Contract Clause requires that state legislation be "addressed to a legitimate end[.]"
 
 Home Bldg.
 
 ,
 
 290 U.S. at 438
 
 ,
 
 54 S.Ct. 231
 
 . And we have already determined that a state's interest in serving its farming and rural communities is "unquestionably significant and legitimate,"
 
 Equip. Mfrs. Inst.
 
 ,
 
 300 F.3d at 860
 
 , irrespective of whether the benefits to them are incidental.
 

 In
 
 Equipment Manufacturers Institute
 
 , this Court was very clear as to why the South Dakota legislation at issue there had no significant and legitimate public purpose:
 

 the state produced no evidence of the advancement of a broad societal interest and, indeed, conceded that the legislation's "purpose [was] to level the playing field between manufacturers and dealers."
 

 Id.
 

 at 860-62
 
 . Accordingly, "[i]t [was] clear that the only real beneficiaries under the [South Dakota legislation were] the narrow class of dealers of agricultural machinery."
 

 Id.
 

 at 861
 
 . Without its readily apparent and exclusively protectionist features, the South Dakota legislation would have fared better.
 
 See
 

 Exxon Corp.
 
 ,
 
 462 U.S. at 191-92
 
 ,
 
 103 S.Ct. 2296
 
 (distinguishing a permissible law "impos[ing] a generally applicable rule of conduct designed to advance 'a broad societal interest,' " from an impermissible law with the "sole effect" of "alter[ing] contractual duties" (quoting
 
 Allied Structural
 
 ,
 
 438 U.S. at 249
 
 ,
 
 98 S.Ct. 2716
 
 )).
 

 Ensuring that North Dakota's agriculture industry, a large component of its economy, is stable and beneficial for all of its participants is squarely within the province of the North Dakota legislature, notwithstanding the imperatives of the Contract Clause.
 
 See
 

 Farmers Union Oil Co. v. Allied Prods. Corp.
 
 ,
 
 162 B.R. 834
 
 , 841 (D.N.D. 1993) ("[I]t is undisputed that North Dakota's economy is heavily dependent on agricultural production.");
 
 cf.
 

 Hall GMC, Inc. v. Crane Carrier Co.
 
 ,
 
 332 N.W.2d 54
 
 , 61 (N.D. 1983) (finding significant and legitimate public purpose behind North Dakota statute protecting farm equipment distributors because a farm equipment "distributor service is a substantial public need in [North Dakota's] economic system").
 

 Because the "sole effect" of SB 2289 is not "to alter contractual duties[,]"
 
 Exxon Corp.
 
 ,
 
 462 U.S. at 192
 
 ,
 
 103 S.Ct. 2296
 
 , we should not second-guess the legislature's sound judgment.
 
 See
 

 Mascio v. Pub. Emps. Ret. Sys. of Ohio
 
 ,
 
 160 F.3d 310
 
 , 314 (6th Cir. 1998) (refusing to "question the legitimacy of the purposes put forward" by the Ohio legislature);
 
 Kendall-Jackson Winery, Ltd. v. Branson
 
 ,
 
 82 F. Supp. 2d 844
 
 , 875 (N.D. Ill. 2000) ("Unquestionably, the state interests served by a strong local distributorship network are substantial, and a judgment by the Illinois legislature that that interest is best-served by prohibiting termination of distributorships except for good cause is beyond challenge.");
 
 Deere
 
 ,
 
 130 A.3d at 1211-12
 
 (stating that it would not "second-guess [the New Hampshire legislature's] determination[,]" refusing to "require of the legislature courtroom factfinding[,]" and stating that it "will uphold a legislative choice based on rational speculation" (internal quotation marks and citations omitted)).
 

 The Court is unwilling to defer to the North Dakota legislature's judgment as to
 
 why
 
 it enacted SB 2289 but would give "complete deference" to a legislature's assessment that a law "is reasonable and necessary to serve an important public purpose[,]"
 
 U.S. Trust
 
 ,
 
 431 U.S. at 25-26
 
 ,
 
 97 S.Ct. 1505
 
 , or, in other words, "the means chosen to implement" the purposes behind the law.
 
 Energy Reserves
 
 ,
 
 459 U.S. at 418
 
 ,
 
 103 S.Ct. 697
 
 ;
 
 see
 

 also
 

 Keystone Bituminous Coal Ass'n v. DeBenedictis
 
 ,
 
 480 U.S. 470
 
 , 506,
 
 107 S.Ct. 1232
 
 ,
 
 94 L.Ed.2d 472
 
 (1987) (refusing "to second-guess the [Pennsylvania legislature]'s determinations" about "the most appropriate ways of dealing with the problem");
 
 Home Bldg.
 
 ,
 
 290 U.S. at 447-48
 
 ,
 
 54 S.Ct. 231
 
 ("Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned."). However, by not deferring to the legislature, the Court substitutes its own judgment for that of the legislature. Underscoring the Court's unusual approach today is the fact that the Supreme Court has very rarely-and perhaps in only a single instance-invalidated state legislation for not having a significant and legitimate public purpose.
 

 See
 

 Energy Reserves
 
 ,
 
 459 U.S. at
 
 412 n.13,
 
 103 S.Ct. 697
 
 (noting that in
 
 Allied Structural
 
 , the Minnesota legislature "had not acted to meet an important general social problem" because the statute at issue "had a very narrow focus" and, indeed, "may have been directed at one particular employer planning to terminate its pension plan when its collective-bargaining agreement expired").
 

 Because the North Dakota legislature was pursuing a broad societal interest in enacting SB 2289, the state has met its burden of showing a significant and legitimate public purpose underlying the legislation. Accordingly, the district court abused its discretion in entering its preliminary injunction upon concluding that the appellees were likely to prevail on the merits of their Contract Clause claim and, therefore, the preliminary injunction should be vacated. I respectfully dissent.
 

 The Court states that
 
 City of El Paso
 
 and
 
 Manigault
 
 simply "refer to discretion in choosing a means to implement a law's purpose
 
 if
 
 the State is properly exercising its police power-
 
 i.e.
 
 , if the law has a significant and legitimate public purpose."
 
 Supra
 
 , at 734 n.2. But neither case support that interpretation. The Supreme Court has said very little about a state's burden to show a significant and legitimate public purpose behind legislation that substantially impairs preexisting contracts between private parties. In
 
 Energy Reserves
 
 , it said a state has to
 
 identify
 
 such a public purpose before a court addresses the final step of the Contract Clause analysis, and found "little doubt about the legitimate public purpose behind the" Kansas legislation at issue there.
 
 459 U.S. at 412, 417
 
 ,
 
 103 S.Ct. 697
 
 . Notably, the Supreme Court found it relevant that there was no "indication that the Kansas political process had broken down."
 

 Id.
 

 at 417 n.25,
 
 103 S.Ct. 697
 
 (citing Note,
 
 A Process-Oriented Approach to the Contract Clause
 
 ,
 
 89 Yale L.J. 1623
 
 , 1645 (1980), for the proposition that, "provided 'legislature is functioning properly, selection of a public purpose and determinations of necessity and appropriateness should be left to it' ").