**BURLINGTON NORTHERN RAILROAD COMPANY,** Appellant,

v.

**STATE OF NEBRASKA; the Nebraska Public Service Commission,** Appellees.

No. 85–1683.

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1986.

Decided Sept. 30, 1986.

Richard A. Knudsen, Lincoln, Neb., for appellant.

John Boehm, Asst. Atty. Gen., Lincoln, Neb., for appellees.

Before JOHN R. GIBSON and WOLL-MAN, Circuit Judges, and HARRIS,* Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

Burlington Northern Railroad Company appeals from an order of the district court upholding the constitutionality of Nebraska's statute requiring that the last car on any train over 1,000 feet long operating in the state be a manned caboose. Neb.Rev. Stat. § 74–5,100 (Cum.Supp.1984) (LB 179). Burlington Northern sought to have the statute declared unconstitutional and its enforcement enjoined on the basis that it was preempted by federal legislation, exceeded the state's police power, unreasonably burdened interstate commerce, and unconstitutionally impaired a contractual right. On appeal, Burlington Northern argues that the district court (1) improperly failed to balance the burden imposed on interstate commerce against the state's asserted safety interest, (2) improperly excluded evidence tending to refute the existence of a safety interest, and (3) erred in

---

* The HONORABLE OREN HARRIS, Senior District Judge for the Western District of Arkansas, sitting by designation.

holding that the statute did not violate the Contract Clause of the United States Constitution. We affirm the district court's holding that the statute does not violate the Contract Clause. We conclude, however, that the district court erred in failing to balance the statute's impact on interstate commerce against the state's asserted safety objectives. We also conclude that the district court erred in excluding lay opinion testimony on the safety issue. We therefore remand this case for further proceedings consistent with this opinion.

On October 15, 1982, Burlington Northern and the United Transportation Union entered into a collectively bargained contract in which Burlington Northern was authorized to seek, with the Union's consent or through an arbitration award, removal of cabooses from some trains.[1] Subsequently, Burlington Northern notified the Union of its intent to remove cabooses from a number of trains, some of which operated in Nebraska. The Union objected and Burlington Northern sought and obtained an arbitration award authorizing the removal.

On March 28, 1983, Nebraska enacted LB 179, which imposed the caboose requirement.[2] After this litigation commenced, LB 179 was amended to gradually increase the length of the trains excepted from its

requirements and ultimately, effective April 15, 1988, to end the manned caboose requirement. Violation of LB 179 is a misdemeanor.[3]

The district court made detailed findings regarding the safety interest promoted by LB 179. Three findings, it concluded, disposed of the question whether LB 179 unconstitutionally burdened interstate commerce. First, the court found that the safety justification for the law was not slight, problematical, or illusory. Second, the court found that, reviewing either the actual legislative purpose, as apparent from the statute's legislative history, or the reasons advanced at trial, the state acted to further a legitimate public safety interest. Third, the court found that the exceptions to LB 179 did not so weaken the statute as to preclude the special deference with which state safety legislation is to be regarded. *Burlington Northern Railroad Company v. State of Nebraska*, CV83–L–423, slip op. at 24 (D.Neb. May 10, 1985).

The district court found that the Nebraska legislature enacted LB 179 in response to the 1982 collective bargaining agreement, out of concern that that agreement did not adequately protect the public safety interest in railroad operations. *Id.* at 25. The legislative debate prior to passage of

---

1. The collective bargaining agreement was industry-wide. It stated that caboose removal would be handled on an individual railroad basis, and placed a twenty-five percent limit on the number of cabooses that may be removed pursuant to an arbitration award. With the Union's consent, however, potentially all cabooses could be removed. *Plaintiff's Exhibit* 2.

2. The statute, as codified, provided, in relevant parts:

> **74–5,100 Cabooses; operation of freight train; requirements.** (1) except as provided in subsection (2) of this section, whenever a railroad operates a freight train in this state, except for trains of under one thousand feet, the rear car of the freight train shall be a manned caboose.
>
> (2) A defective freight car that cannot be entrained except behind the caboose may be the rear car from the point at which it is entrained, other than a terminal where repairs can be made, to the first terminal where repairs can be made.

\* \* \* \* \* \*

> **74–5,102 Cabooses; violation; penalty.** Violation of section 74–5,100 or 74–5,101 shall be a Class IV misdemeanor.

3. The amending legislation makes the following changes:

> 1. Starting July 17, 1986, the provision requiring cabooses on trains over 1,000 feet is repealed. Instead, effective that date, cabooses are required only on trains over 6,500 feet.
> 2. Effective April 15, 1987, cabooses are required only on trains over 8,500 feet.
> 3. Effective April 15, 1988, no cabooses are required on trains in Nebraska.
> 1986 Neb.Laws LB 807, 89th Leg.2d Sess.
>
> We determined that the amendment does not render this case moot since it has not yet eliminated the caboose requirement for all trains. Further, under Nebraska law, appellant remains subject to prosecution for its preamendment violations.

the statute, the court found, demonstrates that this safety interest was the sole impetus for LB 179. *Id.* at 24. The Act's supporters stressed the unique nature of the safety concerns in Nebraska: essentially that Nebraska's topography resulted in longer trains travelling frequently in open country where fires and accidents, if not detected by a caboose crew, could go undetected for a long time, resulting in unnecessary loss of life and property. *Id.* at 25. The Bill's exception from its caboose requirement for trains under 1,000 feet long reflected the legislators' conclusion that an engine crew could see only that length from the front of the train. Thus, the court concluded, regardless of the accuracy of the factual basis prompting their action, the legislature acted upon a valid concern about a matter of public interest by adopting a measure that facially bore a rational relationship to perceived problems.

The district court next evaluated three areas in which the state believed manned cabooses would advance public safety. First, the state was interested in preventing right-of-way fires; railroading was the second leading cause of right-of-way fires in Nebraska from 1978 to 1982. Slip op. at 30. Right-of-way fires resulted largely from defective or malfunctioning equipment, glowing carbon particles expelled through locomotive exhaust systems, and signal flares. *Id.* The state's evidence regarding the role of manned cabooses in detecting, preventing, or minimizing the damage caused by right-of-way fires was largely anecdotal. *Id.* The court found that the role of manned cabooses in detecting or preventing right-of-way fires was, in all likelihood, minimal and a significant amount of these problems could be detected through mechanical means. *Id.* at 31. The court, however, took judicial notice of the fact that much of rural Nebraska is lightly populated and many of its roads and highways are lightly travelled. On these routes, the court concluded, it is more likely that manned cabooses are required to watch for right-of-way fires. *Id.*

A second area of specific legislative concern was rail-highway crossing accidents.

The court found that rail-highway crossing accidents are the greatest causes of death and serious injury in railroad operations. The legislature felt that caboose crews are in a position to spot accidents occurring toward the rear portion of long trains, out of the view of the locomotive crew. Again, there was anecdotal testimony regarding incidents in which the caboose crew was instrumental in spotting and, in some instances, preventing some accidents. Nonetheless, the court noted "[t]he relative infrequency of crossing accidents in which caboose crews play an indispensable role." *Id.* at 32. The court concluded, however, that the caboose crew could perform some safety functions in these cases, even though the impact may be statistically small. *Id.*

The third area of specific legislative concern was train derailments causing personal and property injury. The caboose crew's role in derailments consists largely of spotting defective equipment and other mechanical problems which usually cannot be spotted by the locomotive crew. *Id.* at *37.* The court evaluated in detail the mechanical means available to detect many of the problems which could lead to derailment. The court acknowledged that these changes significantly reduce the role played by caboose crews. Nonetheless, the court concluded, the caboose crew supplements the mechanical detectors and other innovations and thus provides a small safety benefit. *Id.* at 46.

The court concluded its analysis with the assessment that "the total effect of the Nebraska caboose law as a safety measure is not slight, dubious or problematic or illusory. No matter how hefty the law's incidental burden on commerce may be, its safety purposes are furthered substantially enough that it is not vulnerable to a commerce clause challenge." *Id.* at 51. The district court thus concluded that, for a state statute which advances a nonillusory safety purpose, the Commerce Clause inquiry ends without any consideration of the law's effect on interstate commerce. In so concluding, the court relied heavily on its

reading of the three opinions in *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981).

## I.

 The Commerce Clause of the United States Constitution authorizes Congress to "regulate commerce * * * among the several states * * *." U.S. Const. art. 1 § 8. Where Congress exercises its power pursuant to the Commerce Clause, inconsistent state legislation affecting commerce is preempted. The Commerce Clause long has been held to be self-executing, *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945). Thus, even in the absence of preemptive legislation, it bars state regulations that unduly burden interstate commerce. The Commerce Clause "affords one protection from state legislation inimical to the national commerce, and * * * where Congress has not acted, this Court, and not the state legislature, is under the commerce clause, the final arbiter of competing demands of state and national interests." *Id.* at 769, 65 S.Ct. at 1520; *see also, Raymond Motor Transportation Inc. v. Rice*, 434 U.S. 429, 440, 98 S.Ct. 787, 793, 54 L.Ed.2d 664 (1978); *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977). This self-executing feature of the Commerce Clause is frequently referred to as the dormant Commerce Clause.

Not all state legislation which incidentally burdens commerce violates the dormant Commerce Clause. The general criteria by which the validity of state regulations affecting commerce is evaluated is succinctly stated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970):

Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. * *

If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate commerce.

*Id.* at 142, 90 S.Ct. at 847 (citations omitted).

 States' power to regulate commerce is greatest when they act on matters of local concern, *Kassel v. Consolidated Freightways*, 450 U.S. at 670, 101 S.Ct. at 1316; *Hunt v. Washington Apple Advertising Commission*, 432 U.S. at 350, 97 S.Ct. at 2445, and state regulations enacted to promote public health and safety are accorded particular deference. *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. at 443, 98 S.Ct. at 795; *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 109, 69 S.Ct. 463, 465, 93 L.Ed. 533 (1949). Challengers to state regulations enacted to further public safety must overcome a "strong presumption of their validity." *Raymond*, 434 U.S. at 444, 98 S.Ct. at 795; *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 524, 79 S.Ct. 962, 964, 3 L.Ed.2d 1003 (1959).

The Supreme Court has been extremely divided on the nature and scope of the review accorded state legislation that is enacted to further safety interests and that incidentally burdens interstate commerce. Any analysis of this issue requires conscientious regard to the Court's opinions in *Bibb v. Navajo Freight Lines, Raymond Motor Transportation Company v. Rice*, and *Kassel v. Consolidated Freightways*, three cases in which the Supreme Court sustained Commerce Clause challenges to state highway safety regulations.

In *Bibb v. Navajo Freight Lines*, the Supreme Court held that a highway safety statute which did not discriminate against commerce nonetheless unconstitutionally burdened interstate commerce. 359 U.S. at 529, 79 S.Ct. at 967. Illinois enacted a statute requiring trucks traveling its roadways to be equipped with contoured mud-

guards. The state introduced evidence, which the challengers contradicted, that contoured mudguards were decidedly safer than straight mudguards. The Court adopted the district court's finding that contoured mudguards possessed no safety advantage over straight mudguards, and in fact created additional road hazards not encountered with straight mudguards. *Id.* at 525, 79 S.Ct. at 965. In effect, then, the Illinois statute furthered a slight or nonexistent safety interest and did not outweigh the massive burden imposed on interstate commerce.

The Court's analysis in *Bibb* is instructive as to the policies relevant to dormant Commerce Clause analysis and how they circumscribe the scope of courts' review of state public safety legislation. The Court noted the state's substantial power to enact local safety measures, *id.* at 526, 79 S.Ct. at 966, and the particularly local nature of highway safety regulations. *Id.* at 523–24, 79 S.Ct. at 964–65. The Court then stressed that its role was not to second-guess the means chosen by the legislature to achieve its purpose:

> [S]afety measures carry a strong presumption of validity when challenged in court. If there are alternative ways of solving a problem, we do not sit to determine which of them is best suited to achieve a valid state objective. Policy decisions are for the state legislature, absent federal entry into the field.

*Id.* at 524, 79 S.Ct. at 964.

██ This deference to legislative means, however, coexisted with the awareness that "state regulations that run afoul of the policy of free trade reflected in the commerce clause must * * * bow." *Id.* The Court made clear that dormant Commerce Clause analysis is not complete without a weighing of the asserted safety purpose for the statute against the burden imposed on interstate commerce. Thus, state legislation which incidentally burdens commerce survives Commerce Clause challenge "unless we can conclude on the whole record that 'the total effect of the law as a safety measure in reducing accidents and casual-

ties is so slight or problematical as not to outweigh the national interest in keeping interstate commerce free from interferences which seriously impede it.'" *Id.* at 524, 79 S.Ct. at 964 (citation omitted).

It is important to note the nature of the burden on interstate commerce which the *Bibb* Court termed "rather massive." *Id.* at 528, 79 S.Ct. at 967. The costs of complying with the regulation alone, the Court stated, would be an insufficient basis for concluding that the statute unconstitutionally burdened interstate commerce. *Id.* at 526, 79 S.Ct. at 966. *See also Terminal Railroad Association of St. Louis v. Brotherhood of Railroad Trainmen,* 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571 (1943) (effect of regulation was increased cost of movement; state safety interest not outweighed). Instead, the essential inquiry was whether the burden imposed on interstate commerce was such that it severely impeded the smooth flow of commerce between the states. Thus, the fact that the Illinois statute made illegal the type of mudguards required by some surrounding states was particularly significant: the effect was an unconstitutional obstacle to interstate movement. *Id.* 359 U.S. at 530, 79 S.Ct. at 968.

Where the statute in *Bibb* failed, in part, because the state did not rebut the challenger's showing of a "massive" burden on interstate commerce, the statute in *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978), failed because the state did not rebut the challengers' considerable evidence that the regulation prohibiting operation on the state's roadways of trucks over 55 feet in length did not further the state's safety objective. The state left uncontradicted the challengers evidence that 65–foot double trailers were as safe as or safer than 55–foot singles.

Justice Powell, writing for four justices, stated that an inquiry into whether state legislation in an area of legitimate local concern unconstitutionally burdens interstate commerce "necessarily involves a sensitive consideration of the weight and na-

ture of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." *Id.* at 441, 98 S.Ct. at 794. The Court expressly rejected the assertion that it must defer to state safety legislation without weighing the burden on interstate commerce. "We cannot accept the state's contention that the inquiry under the Commerce Clause is ended without a weighing of the asserted safety interest against the burden on commerce." *Id.* at 443, 98 S.Ct. at 795.

Justice Blackmun concurred in the judgment but, in a separate opinion joined by four justices, expressed his view of the scope of the Court's decision.[4] He agreed that it is the Court's responsibility to "weigh the national interest in free flowing commerce against 'slight or problematical' safety interests." *Raymond*, 434 U.S. at 449, 98 S.Ct. at 798 (Blackmun, J., concurring), (quoting *Bibb v. Navajo*, 359 U.S. at 524, 79 S.Ct. at 964). He stressed, however, that the balance is struck differently when the state legitimately seeks to further a public safety objective than when merely economic interests are at stake. *Id.* at 448–49, 98 S.Ct. at 797–98 (indicating that in *Pike v. Bruce Church*, the state's interest in "promoting and preserving the reputation of Arizona growers by prohibiting deceptive packaging" deserved and received less deference).

Justice Blackmun added that "if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce." *Raymond*, 434 U.S. at 449, 98 S.Ct. at 798. Read in isolation, this phrase seems to contradict his preceding endorsement of a balancing approach. In the very next sentence, however, the Justice states that his concurrence rests on the fact that the majority adhered to the principle, expressed in *Bibb*, that the Court will not choose among competing alternative means of achieving legislative objectives. He stressed that the regulation in *Raymond* was unconstitution-

al not because it was not the most effective means of achieving the state's safety objective, but because, on the existing record, the safety benefits were not shown to exist as a matter of law. Thus, it appears that the second-guessing which Justice Blackmun deemed objectionable was choosing among competing means to identify one which best achieves the State's safety objective. *Id.* at 450, 98 S.Ct. at 798. His later endorsement in *Kassel* of a balancing test supports the conclusion that he did not intend in his *Raymond* concurrence to preclude weighing the burden on commerce in dormant Commerce Clause analysis.

*Kassel v. Consolidated Freightways*, 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981), has done little to clarify the Court's position on this issue. In *Kassel*, a plurality of the Court held that Iowa's law prohibiting the use of 65 foot double-trailers on its roads unconstitutionally burdened interstate commerce. Justice Powell again wrote for four justices, and reaffirmed that the Court will balance against a state's asserted safety objectives the burden imposed on interstate commerce. Justice Powell reasserted the great deference due state legislation in matters of local concern, particularly in the area of highway safety. An analysis of the safety interest, however, constitutes only one-half of the dormant Commerce Clause analysis:

> The incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack. Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause. * * * This 'weighing' by a court requires—and indeed the constitutionality of the state regulations depends on— 'a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce.'

---

4. Chief Justice Burger and Justices Brennan and Rehnquist joined in Justice Blackmun's concur-

rence. Justice Stevens did not participate in this opinion.

*Id.* at 670, 101 S.Ct. at 1316 (citations omitted).

Iowa defended the law as a reasonable safety measure enacted pursuant to its police power. Even though the state attempted to rebut contrary evidence regarding its safety interests, the Court held that the record supported the district court's finding that 65–foot doubles were as safe as either 60–foot doubles or 55–foot singles. *Id.* at 672, 101 S.Ct. at 1317. The Court held that the state had failed to establish that its legislation substantially furthered a safety interest.

The Court also noted that the legislation substantially burdened interstate commerce by forcing interstate trucking companies to choose among alternatives which engendered significant inefficiency and expense. *Id.* at 674, 101 S.Ct. at 1318. In contrast, the regulation contained numerous exemptions which benefitted in-state residents and businesses. *Id.* at 675–76, 101 S.Ct. at 1318–19. Because of this disproportionate burden on out-of-state interests, Justice Powell found that the regulation was not entitled to the special deference normally accorded the legislature's judgment in matters of highway safety.[5]

Justice Brennan wrote separately, concurring in the judgment but for different reasons. For Justice Brennan, analysis of Commerce Clause challenges to state legislation implicates three principles: (1) the courts are not empowered to second-guess legislatures' empirical judgments regarding the utility of legislation; (2) the courts must balance the local benefits the legislators actually sought to achieve, and not those suggested after the fact by counsel, against the burden imposed on interstate commerce; (3) protectionist legislation violates the Commerce Clause even if it is related to safety rather than economics. *Id.* at 679–80, 101 S.Ct. at 1320–21.

Justice Brennan determined that the Iowa legislature's intent was protectionist, and therefore invalid. This threshold determination resolved the constitutionality of the regulation without need for examining the burden on interstate commerce.[6] In a footnote, however, he expressed his disagreement with Justice Powell's conclusion that, in the field of safety, the Court is authorized to balance "asserted burdens against intended benefits." *Id.* at 681 n. 1, 101 S.Ct. at 1321 n. 1. He endorsed the view that where the state's safety interest is not illusory or problematical, the Court will uphold the legislation without regard to the impact on interstate commerce. *Id.*

Justice Rehnquist dissented from the plurality in an opinion joined by Justices Stewart and Burger.[7] Justice Rehnquist's analysis reflects a fundamental opposition to the Court's traditional role in analyzing state legislation that incidentally burdens interstate commerce. The Justice believes that the Court's "limited authority to review state legislation under the Commerce Clause," *Kassel,* 450 U.S. at 687, 101 S.Ct.

5. Justice Powell made clear that *Locomotive Firemen v. Chicago R.I. & P.R. Co.,* 393 U.S. 129, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968), "in its result, although perhaps not in all of its language, is consistent with the conclusion we reach today." *Locomotive Firemen* upheld Arkansas "full crew" laws because they made nonillusory contributions to safety. 450 U.S. at 678 n. 25, 101 S.Ct. at 1320 n. 25.

6. Justice Brennan disagreed with the plurality's evaluation of all the safety evidence—pro and con—to determine that in sum the legislation failed to advance the state's asserted purpose. While focusing on the legislature's actual intent, he excluded any consideration of whether the state's asserted objective actually is achieved in any degree. Justice Brennan stressed that "it is not the function of the court to determine whether *in fact* the regulation promotes its intended purpose, so long as an examination of the evidence before or available to the lawmaker indicates that the regulation is not wholly irrational in light of its purposes." *Kassel,* 450 U.S. at 680–81, 101 S.Ct. at 1321–22 (Brennan, J., concurring) (emphasis in original). This seems a more extreme interpretation of the policy, expressed in *Bibb,* that courts must defer to the legislature's policy choice rather than choose between alternative methods of achieving an end.

7. An attempt to predict the Court's alignment by "counting noses" in *Kassel* fails, among other reasons, because two of the three justices joining Justice Rehnquist's dissent are no longer with the Court.

at 1324 (Rehnquist, J., dissenting) (citations omitted), extends only to ascertaining that the legislation does not discriminate against interstate commerce. While Justice Rehnquist eschews an open-ended weighing of the safety justification against the burden on interstate commerce, he does not advocate that the burden on interstate commerce plays no role in dormant Commerce Clause analysis. He states that "a determination that a state law is a rational safety measure does not end the Commerce Clause inquiry. A 'sensitive consideration' of the safety purpose in relation to the burden on commerce is required." *Id.* at 691, 101 S.Ct. at 1326 (quoting *Raymond*, 434 U.S. at 441, 98 S.Ct. at 794).

The purpose of the "sensitive consideration" referred to above is * * * to determine if the asserted safety justification, although rational, is merely a pretext for discrimination against interstate commerce. We will conclude that it is if the safety benefits from the regulation are demonstrably trivial while the burden on commerce is great.

*Kassel*, 450 U.S. at 692, 101 S.Ct. at 1327 (Rehnquist, J., dissenting).

These cases show the difficulty of reconciling the deference due state safety legislation with the Court's mandate to administer the self-executing principles of the Commerce Clause in a manner that prevents undue burden on interstate commerce. It is not an easy task to generalize from these cases. There are, however, recurrent themes which, when carefully considered in light of the policy behind the Commerce Clause, provide some guidance in analyzing succeeding cases. First, the Court has consistently declined to choose among competing alternative means of achieving an asserted safety objective. Thus, courts' "sensitive consideration" of state safety legislation is limited to an analysis of whether the state legitimately acted in furtherance of safety objectives. It does not involve a comparative analysis of legislative alternatives. Second, the Court consistently has incorporated into its analysis some evaluation of the burden that the legislation in question places on interstate commerce.[8] The balancing must, however, reflect the great deference due state safety legislation. The challengers may prevail only if the burden on interstate commerce is clearly excessive in relation to the safety purpose of the state legislation.

In *Sporhase v. Nebraska*, 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982), the Court, without discussion, applied a balancing test to what it deemed a state health and safety regulation. In *Sporhase*, the Court addressed the constitutionality of a Nebraska statute restricting the withdrawal of groundwater from any well within the state for use in an adjoining state. The Court accepted the statute as a health and safety regulation serving an "unquestionably legitimate and highly important" state interest. *Id.* at 954, 956, 102 S.Ct. at 3463, 3464. The statute imposed four requirements for obtaining the necessary permit to withdraw groundwater: the use request must be reasonable, not contrary to conservation and use of groundwater, and not otherwise detrimental to the public welfare, and the state in which the water is to be used must grant reciprocal rights to withdraw and transport its groundwater to Nebraska. The Court found that the first three requirements of the statute were reasonable in light of the state's interest and did not impermissably burden interstate commerce. The Court expressly invoked the *Pike v. Bruce Church* balancing test, *id.* at 954, 102 S.Ct. at 3463, but did not engage in an extended analysis of the burden on interstate commerce. The Court found, however, that the challengers apparently conceded the reasonableness of these

---

**8.** The footnote in Justices Brennan and Marshall's concurring opinion in *Kassel* constitutes the only express rejection of consideration of any degree the burden on commerce. The weight to be accorded this statement is uncertain given the limited discussion accompanying the footnote, the fact that it was in dicta,

three requirements,[9] *id.* at 957, 102 S.Ct. at 3464, thereby rendering an extensive analysis unnecessary.

We believe that the *Pike v. Bruce Church* balancing test, as adapted in *Bibb, Raymond,* and the plurality in *Kassel,* properly accommodates the principles behind dormant Commerce Clause analysis. While any balancing of the burden on commerce against local public safety interests entails some difficulty, a refusal to regard the burden on interstate commerce in any degree simply is not a principled resolution of these difficulties. The Commerce Clause is a specific recognition of the potential conflicts that arise if each state acts simply to advance its local interests, reaching its own accommodation of the importance of the national interest. An evaluation of the state's safety interest only begins the process of accommodation which, in the absence of congressional action, the Court has recognized as its role. It would not unduly tax the imagination to conceive of nondiscriminatory state legislation that advances some legitimate safety objective slightly, yet imposes massive burdens on interstate commerce. An analysis that disregards this fact by failing to balance the burdens imposed on interstate commerce against the local interest involved cannot be considered an accommodation of the competing demands of the state and national interests.

■ We hold that the district court erred in failing to weigh the burden on interstate commerce imposed by the Nebraska statute against the safety interest advanced by the legislation. Because we conclude that the district court also erred in excluding certain opinion testimony regarding whether manned cabooses advance public safety, we remand the case for reconsideration. On remand, the court is instructed to re-evaluate whether the manned caboose requirement, in light of all the evidence, furthers a safety interest that is not slight,

illusory, or problematical. If the statute does meet this requirement, the court then must balance the burden imposed on interstate commerce against the asserted safety interests.

**II.**

Burlington Northern also challenges the district court's exclusion of the lay opinion testimony of four executives of railroads that had initiated cabooseless operations prior to the 1982 collective bargaining agreement. Burlington Northern maintains that the railroad executives' tesimony was based on their extensive personal knowledge acquired from day-to-day supervisory responsibilities, including review of accident reports filed after all accidents in the ordinary course of business. These officers testified, or were expected to testify that, in their experience, trains with cabooses were no safer than cabooseless trains. The district court disregarded this testimony on the basis that Burlington Northern was unable to overcome hearsay and foundation objections to the testimony. Slip Op. at 46–47. The court considered testimony from these witnesses only to the extent that it was based on personal observations.

■ The district court has broad discretion in determining whether to admit opinion testimony and we overturn a ruling only for abuse of discretion. *Brewer v. Jeep Corp.,* 724 F.2d 653, 657 (8th Cir. 1983); *Scheib v. Williams-McWilliams Co.,* 628 F.2d 509, 511 (5th Cir.1980). A lay witness' testimony in the form of opinions or inferences need only be rationally based on perception and helpful to a determination of a fact in issue. *Greenwood Ranches, Inc. v. Skie Construction Co.,* 629 F.2d 518, 522 (8th Cir.1980); *see also* Fed.R.Evid. 701. Personal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry

---

and the fact that it markedly departs, without explanation, from these Justices' prior positions.

9. The Court held that the fourth requirement did not survive the strictest scrutiny applied to facially discriminatory legislation. *Sporhase,* 458 U.S. at 958, 102 S.Ct. at 3465.

experience, is a sufficient foundation for lay opinion testimony. *See, e.g., Farner v. Paccar, Inc.,* 562 F.2d 518, 520 (8th Cir. 1977) (allowing lay opinion testimony of truck operator with extensive experience in the industry regarding the proper use of safety chains); *Gravely v. Providence Partnership,* 549 F.2d 958, 961 (4th Cir. 1977) (allowing lay opinion testimony of company's president regarding relative safety of conventional versus spiral staircase).

▄▄▄ The railroad executives' testimony, based on knowledge derived from supervising railroad operations, years of experience in the industry, and review of employee accident reports prepared in the ordinary course of business, satisfies the foundation requirements for lay opinion testimony. The fact that some knowledge was gained from employee accident reports does not, in this case, render the testimony hearsay. Given the close question presented by the safety issue in this case, we believe this testimony was highly relevant. We conclude that the district court's failure to consider this evidence was an abuse of discretion.[10]

### III.

Finally, we address Burlington Northern's contention that the Nebraska caboose statute violates the Contract Clause of the United States Constitution, which provides: "No state shall * * * pass any * * * Law impairing the Obligation of Contracts." U.S. Const. art. 1, § 10. Burlington Northern argues that the statute eviscerates its right under the 1982 collective bargaining agreement to seek removal of cabooses from its trains, and that the district court's finding that Nebraska enacted the statute in direct response to the agreement is evidence of the law's infirmity.

▄▄▄ The Court has long held that a statute does not violate the Contract Clause simply because it affects, or even altogether bars, the performance of duties created by contracts entered into before its enactment. *Exxon Corporation v. Eagerton,* 462 U.S. 176, 190, 103 S.Ct. 2296, 2305, 76 L.Ed.2d 497 (1983); *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241–42, 98 S.Ct. 2716, 2720–21, 57 L.Ed.2d 727 (1978). The prohibitions of the Contract Clause "must be accommodated to the inherent police power of the state to 'safeguard the vital interests of its people.'" *Id.; Energy Reserves Group Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 410, 103 S.Ct. 697, 703, 74 L.Ed.2d 569 (1983) (citation omitted).

---

**10.** Burlington Northern also challenges the district court's refusal to admit certified copies of arbitration awards permitting railroads to run trains without cabooses. The court excluded this evidence because the exhibits were not listed as intended evidence pursuant to the pretrial order. Burlington Northern argues that it did not include these exhibits in the pretrial report because the need to admit them did not arise until midtrial. It attempted to submit these exhibits only after the district court excluded Burlington Northern's witnesses' testimony as to the arbitration results.

The district court may, in its discretion, exclude exhibits not disclosed in compliance with pretrial orders and such a ruling will be reversed on appeal only for abuse of discretion. *Dabney v. Montgomery Ward & Co.,* 692 F.2d 49, 51 (8th Cir.1982); *cert. denied,* 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983); *Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 896 (8th Cir.1978). Because we remand this case for further consideration of Burlington Northern's safety evidence, we need not determine whether the district court abused its discretion in failing to consider the reason why Burlington Northern failed to disclose these exhibits. We presume that Burlington Northern will properly bring these exhibits to the court's attention on remand and the problem will not reoccur.

Burlington Northern also argues, essentially, that the district court did not give sufficient weight to the testimony of a Federal Railroad Administration official who testified that cabooses are no longer a safety device. The weight due particular evidence is a matter peculiarly within the district court's discretion, and we will not interfere with that determination unless, upon examination of the record as a whole, we "are left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Burlington Northern has not established on the state of the record before this court that the district court's weighing of this evidence was clearly erroneous.

In *Energy Reserves Group*, the Supreme Court employed a three-step analysis derived from *United States Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), and *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), to evaluate whether a state statute violates the Contract Clause. The threshold inquiry is whether the statute substantially impairs a contractual relationship. *Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704. The severity of the impairment increases the strictness of the scrutiny accorded the legislation. *Id.* Also, the extent to which an industry is governmentally regulated is relevant in considering the severity of the impairment.

If the state regulation substantially impairs a contractual obligation, the second inquiry is whether the state had a "significant and legitimate public purpose behind the regulation," *id*, such as remedying a broad general, social, or economic problem. The public purpose need not be addressed to an emergency or temporary situation, as long as the state enacts a generally applicable rule designed to advance the societal interest. *Id.* at 412, 103 S.Ct. at 704. *See Exxon Corp. v. Eagerton*, 462 U.S. at 191, 103 S.Ct. at 2306 (citing, *Allied Structural Steel Co.*, 438 U.S. at 249, 98 S.Ct. at 2724). The final inquiry is whether the adjustment of the rights of the contracting parties is based on "reasonable conditions which justified adoption of the legislation." and is of a character appropriate to the public purpose. *Id.*

Applying this standard to LB 179, we conclude that the district court correctly held that the statute does not violate the Contract Clause. First, it is not clear that the caboose requirement of LB 179 substantially impairs a contractual right. LB 179 does not deny Burlington Northern a right already in existence under the contract. The collective bargaining agreement guaranteed the railroads the right only to negotiate for removal of all cabooses, or to seek permission through arbitration to remove cabooses from twenty-five percent of its trains. While the statute precludes removal of the cabooses, the right to do so under the agreement was, in any event, conditional. Further, we agree with the district court's conclusion that, given the highly regulated nature of the railroad industry, Burlington Northern had no reasonable expectation that it could remove from legislative scrutiny aspects of its operations potentially bearing on public safety. Slip Op. at 54. Finally, as amended, the statute, by gradually phasing out the caboose requirement, at most, delays Burlington Northern's full exercise of its rights under the contract.

Even had we determined that a substantial contractual right is impaired, we believe that the district court correctly concluded that the state exercised its police power in the public interest and there is no evidence of a protectionist intent. Thus, the second requirement of *Energy Reserves* is satisfied.

Finally, the legislation is rationally drawn to effectuate the legislative concern. Accepting as correct, as we must for Contract Clause purposes, the reasonableness of the state's determination that manned cabooses enhance safety in railroad operations, the caboose statute is rationally related to the legislature's safety objectives.[11]

We therefore affirm the district court's judgment that the Nebraska statute does not violate the contract clause. However, we reverse the court's conclusion that the statute does not violate the Commerce Clause, and that the railroad executives' lay opinion testimony was inadmissible.

11. We note here the difference in scrutiny in a Commerce Clause challenge. Our inquiry here does not extend to whether the statute furthers in any degree the legislature's objective. See *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 23, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977) ("in reviewing economic and social regulation * * * courts properly defer to legislative judgment as to necessity and reasonableness of a particular measure").

We remand this case for further proceedings consistent with this opinion.