No. 95-1754

Honeywell, Inc.; Honeywell       *
Pension and Retirement           *
Committee, on their own behalf   *
and on behalf of the Honeywell   *
Retirement Investment Plan;      *
Investment Plus Plan of          *
Honeywell, Inc.; Honeywell       *
Retirement Savings Plan; First   *
Trust National Association,      *
                                 *
        Plaintiffs-Appellants,   *   Appeal from the United States
                                 *   District Court for the
    v.                           *   District of Minnesota.
                                 *
Minnesota Life and Health        *
Insurance Guaranty Association,  *
                                 *
        Defendant-Appellee.      *        [PUBLISHED]


_____

Submitted:  October 22, 1996

Filed: April 2, 1997
_____

Before  RICHARD  S.  ARNOLD,  Chief  Judge,  McMILLIAN,  JOHN  R.  GIBSON,
    FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, MORRIS  ~~SHEPPARD~~
ARNOLD, and MURPHY, Circuit Judges, en banc.
_____


HANSEN, Circuit Judge.

    The plaintiffs (collectively referred to as Honeywell) appeal the
district court's[1] grant of summary judgment for the defendant,

_____

[1]The Honorable Richard H. Kyle, United States District Judge
for the District of Minnesota.

Minnesota Life and Health Insurance Guaranty Association (the Association), in this declaratory judgment suit. At issue is whether an amendment to a Minnesota statute, which amendment applies retroactively, violates either the Contract Clause or the Due Process Clause of the Constitution of the United States. The district court granted the Association's motion for summary judgment and dismissed Honeywell's complaint, concluding that the amendment passes constitutional muster.

A panel of this court unanimously affirmed the judgment of the district court. Honeywell v. Minnesota Life & Health Ins. Guaranty Assoc., 86 F.3d 766 (1996). Honeywell requested en banc review. We granted this request, vacated the panel's opinion on August 27, 1996, and heard the case en banc. We now affirm the judgment of the district court.

## I. BACKGROUND

Honeywell, Inc. is a Delaware corporation with its principal place of business in Minnesota. Honeywell sponsors certain defined contribution benefit and retirement plans for its employees. These plans include the Honeywell Retirement Investment Plan, the Investment Plus Plan of Honeywell Inc., and the Honeywell Retirement Savings Plan. The current trustee of the Honeywell plans is First Trust National Association, which has its principal place of business in Minnesota.

The Association is a nonprofit Minnesota corporation created pursuant to the Minnesota Life and Health Insurance Guaranty Association Act (the Act), Minn. Stat. Ann. §§ 61B.01-61B.16 (West

2

1986).[2]  The Association exists to protect the contractual rights of policy owners and beneficiaries of life insurance policies, health insurance policies, and annuity contracts (subject to certain definitions and limitations), when the insurer that issued the life insurance, health insurance, or annuity contract becomes financially unable to perform its obligations.  See Minn Stat. Ann. § 61B.02, subd. 2.  See also Minnesota Life & Health Ins. Guar. Assoc. v. Department of Commerce, 400 N.W.2d 769, 770 (Minn. Ct. App. 1987).  To provide this protection, all insurance companies that deal in life, health, and annuity contracts and elect to do business in Minnesota are required to join and contribute to the Association.  Minnesota Life, 400 N.W.2d at 770.  The dispute in this case arose following the 1991 insolvency of an out-of-state member insurance company and the 1992 enactment by the Minnesota legislature of an amendment that retroactively redefines the term "contractual obligation" under the Act.

In 1988, the Honeywell plans' trustee, who was a Minnesota resident (as is the current trustee), invested in Guaranteed Investment Contracts (GICs) issued by Executive Life Insurance Company of California (ELIC), a member of the Association.  GICs are unallocated annuity contracts, or annuity contracts "not issued to or owned by a named individual."  Id. GICs are investments made by the trustee for the benefit of the plan participants and are considered covered policies under the Act.  See id. at 775 (holding that GICs are covered annuities under Minn. Stat. § 61B.03, subd. 3 (1984)).  The Honeywell GICs expressly name the Honeywell trustee

---

[2]This Act has been repealed and was replaced in 1993 with Minn. Stat. Ann. §§ 61B.18 - 61B.32 (West Supp. 1996).  The legislature provided, however, that §§ 61B.01 - 61B.16, as amended in 1992, remain applicable to the subject of this suit.  Honeywell, Inc. v. Minnesota Life & Health Ins. Guar. Assoc., 518 N.W.2d 557, 558 n.4 (Minn. 1994).  The issue in this case deals with a 1992 amendment to the Act, and not the new 1993 version of the Act.

as the policy owner, and not the individual plan participants for whom the investment was made.  Honeywell, 518 N.W.2d at 561.

In 1991, ELIC became insolvent and unable to fulfill its contractual obligations on the Honeywell GICs, which amounted to $111,000,000.  By letter dated January 10, 1992, the Honeywell trustee, as the resident policy owner, submitted to the Association a claim for guaranty coverage under the Act.  Honeywell sought coverage for ELIC's entire obligation to the Honeywell trustee, which would inure not only to the benefit of Honeywell's 9,000 Minnesota resident plan participants but also to Honeywell's 27,000 nonresident plan participants.

The Association neither granted nor denied Honeywell's claim initially.  ELIC's insolvency had also affected approximately 10,000 other Minnesota residents who were employed in Minnesota by other companies whose plan trustees owned GICs but which trustees were not Minnesota residents.  At that time, the Act required the Association to guarantee the covered policies of "residents" to whom any "contractual obligation" was owed from an out-of-state insurer.  Minn. Stat. Ann. § 61B.06, subd. 2 (West 1986).  See Honeywell, 518 N.W.2d at 558.  The term "resident," defined as "any person who resides in this state at the time the impairment is determined and to whom contractual obligations are owed," Minn. Stat. Ann. § 61B.03, subd. 13 (West 1986), was broad enough to include a trustee who resided in Minnesota.  Honeywell, 518 N.W.2d at 560-61.  The term "contractual obligation," defined as "any obligation under covered policies," Minn. Stat. Ann. § 61B.03, subd. 5 (West 1986), was broad enough to include a GIC obligation owed to a resident trustee.  Honeywell, 518 N.W.2d at 560-61.  Thus, as then codified, the Act, combined with ELIC's insolvency, created the potential that all the Honeywell plan participants, thousands of whom were not residents of Minnesota, might be

4

entitled to coverage under the Minnesota Act because their plan trustee happened to be a Minnesota resident. Whereas, many other Minnesota non-Honeywell employed resident plan participants, who worked for companies whose plan trustee resided in a different state, might not be entitled to any coverage because their trustee (the one to whom the contractual obligation was owed) was not a Minnesota resident.

Faced with this dilemma, on January 21, 1992, the Minnesota Department of Commerce (which supervises and regulates the Association and to whom appeals may be taken from the Association's determinations, see Minn. Stat. Ann. § 61B.09(c)), issued an opinion, advising the Association chairman on the coverage problems created by the ELIC insolvency:

> The Department believes it is the clear intent of the Act to cover the people of Minnesota. Accordingly, it is the Department's position that the Guaranty Association Act provides coverage to Minnesota resident employees who are the beneficiaries of defined-contribution pension plans funded by Guaranteed Investment Contracts purchased from Executive Life.

> Consistent with that position the Department has determined that non-resident employees of such a plan, regardless of the residency of the trustee or plan sponsor, are not covered under the Act.

(Appellee's App. at GA-59.)

Subsequently, on April 27, 1992, the governor signed into law an amendment to the definition of the term "contractual obligation," in a purported attempt to retroactively "clarify" the statutory coverage in a manner consistent with the Department of Commerce opinion. Honeywell, 518 N.W.2d at 562. The 1992 amendment, which specifically applies retroactively, narrowed the

definition of "contractual obligation" to specifically <u>exclude</u> any obligation owed "to nonresident participants of a covered plan or to the plan sponsor, employer, trustee, or other party who owns the contract; in such cases, the association is obligated under this chapter only to participants in a covered plan who are residents of the state of Minnesota on the date of impairment." 1992 Minn. Laws, ch. 540. Thus, the amendment expressly provides coverage only to plan participants who are Minnesota residents. In light of the opinion of the Department of Commerce and the retroactive 1992 amendment, the Association took the position that its guaranty obligation to Honeywell covers only those Honeywell plan participants who resided in Minnesota when ELIC became insolvent.

Honeywell then brought an action for declaratory and injunctive relief and monetary damages in Minnesota state court based on the Association's refusal to fully guaranty the whole of the trustee's claim. Honeywell sought a declaration that retroactive application of the 1992 amendment violates both the Contract Clause and the Due Process Clause of the Constitution because Honeywell's entitlement to coverage and payment under the prior statute had fully accrued before the enactment of the 1992 amendment. The Association removed the case to federal district court pursuant to 28 U.S.C. § 1441.

After removal, the parties filed cross motions for summary judgment. The district court ruled in favor of Honeywell, holding that the retroactive abrogation of Honeywell's guaranty coverage rights impermissibly destroyed vested rights in violation of both the Contract Clause and the Due Process Clause of the Constitution. After the Association moved for reconsideration, however, the district court vacated its initial opinion and certified two questions to the Supreme Court of Minnesota: (1) Did the 1992 amendment to the Act's definition of "contractual obligation"

6

effect a substantive change in the Association's obligations or merely clarify existing obligations? (2) Is the annuity contract owner's (the trustee's) right to guaranty payment from the Association a purely statutory right or is it contractual in nature? The Supreme Court of Minnesota ruled on the certified questions, holding that (1) the 1992 amendment to the definition of "contractual obligation" substantively changed the Association's coverage obligations, and (2) the right to payment from the Association is a purely statutory right under state law. See Honeywell, 518 N.W.2d at 563.

After the Supreme Court of Minnesota responded to the certified questions, the parties again filed cross motions for summary judgment. This time, the district court granted the Association's motion for summary judgment, concluding that retroactive application of the 1992 amendment did not violate either the Contract Clause or the Due Process Clause, and dismissed Honeywell's complaint with prejudice. Honeywell appeals.

## II. DISCUSSION

Honeywell contends that its preamendment right to insurance guaranty coverage is contractual in nature and that retroactive application of the amendment constitutes the impairment of its contractual rights in violation of the Contract Clause. Honeywell also argues that the 1992 amendment arbitrarily and irrationally destroyed its accrued, vested right to guaranty coverage, in violation of the Due Process Clause. We begin our analysis with the Contract Clause.

## A. CONTRACT CLAUSE

The Constitution provides, "No State shall . . . pass any Law impairing the Obligation of Contracts . . . ." U.S. CONST. art. I, § 10, cl. 1. Read literally, this constitutional prohibition bans any interference with contracts, but cases interpreting the clause clearly indicate that this prohibition "is not an absolute one and is not to be read with literal exactness like a mathematical formula." Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 428 (1934). Instead, when a litigant contends that a legislative amendment has impermissibly impaired contractual obligations, our inquiry initially focuses on "whether the change in state law has `operated as a substantial impairment of a contractual relationship.'" General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992) (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978)) (other citation omitted). Three basic components are essential to this inquiry: (1) Does a contractual relationship exist, (2) does the change in the law impair that contractual relationship, and if so, (3) is the impairment substantial? Id. If we conclude that a substantial impairment of a contractual relationship exists, we must then carefully examine "the nature and purpose of the state legislation." Allied Structural Steel Co., 438 U.S. at 244.

We first consider whether a contractual relationship exists. In this case, the district court certified to the state supreme court the question of whether the Association's guaranty obligation to GIC owners, such as the Honeywell trustee, is a contractual or a statutory obligation. The Supreme Court of Minnesota determined that the right to payment from the Association is a purely statutory right under state law. Honeywell, 518 N.W.2d at 563. Honeywell first contends that the district court erroneously

8

certified a question of federal constitutional law to the state court.

While federal courts "accord respectful consideration and great weight to the views of the State's highest court," the determination of whether the Act created a contractual obligation "is a federal question for purposes of Contract Clause analysis, and whether it turns on issues of general or purely local law, we can not surrender the duty to exercise our own judgment." Romein, 503 U.S. at 187 (internal quotations omitted). Contrary to Honeywell's assertion, however, the district court did not avoid its duty to determine the constitutional issue by certifying a question to the state supreme court. Instead, the district court gave proper consideration to the state court's views but independently determined that the right to payment under the Act is not contractual within the meaning of the Contract Clause. We review de novo the district court's judgment on this constitutional question. See United States v. Bates, 77 F.3d 1101, 1104 (8th Cir.), cert. denied, 117 S. Ct. 215 (1996).

Our independent review leads us to agree with the district court that the rights at issue are statutory in nature and therefore, no contractual relationship existed between Honeywell and the Association. Two factors lead us to this conclusion: (1) the Act itself does not create a contract, and (2) the GICs do not specifically incorporate the terms of the Act.

First, the Act's guaranty is not itself a contract between the Association and those who qualify for the Act's protection. "In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." United States Trust Co. v. New Jersey, 431 U.S. 1, 17 n.14

9

(1977).  The right to payment under the Act is not enforceable against the state of Minnesota but is an obligation imposed upon the Association.  The Association is a nonprofit legal entity and not a state agency.  Minn. Stat. Ann. § 61B.04, subd. 1 (West 1986).  See also Minn. Stat. Ann. § 61B.21, subd. 1 (West Supp. 1996).  Even if the Association were a state agency, the Act contains no "clear indication that the legislature intends to bind itself contractually," which is necessary in order to overcome the general presumption "that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise."  National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry., 470 U.S. 451, 465-66 (1985) (quotations omitted).  Rather, the Act creates an insurance guaranty association with attendant statutory obligations to safeguard the financial well-being of Minnesota residents to whom contractual obligations are owed by its member insurance companies.  The Act does not create a contract; instead, it creates a statutory safety net to protect the economic well-being of Minnesota resident policy owners in the event a member insurer becomes insolvent.

Second, while the Association has the power to enter into contracts, Minn. Stat. Ann. § 61B.06, subd. 9(a) (West 1986), the Association is not a party to the GICs involved here.  The GICs at issue are contracts between the Honeywell trustee and the impaired ELIC, not the Association.  The Honeywell trustee did not specifically bargain for protection under the Act, and the Act is not expressly or impliedly incorporated into the terms of the GICs.  "For the most part, state laws are implied into private contracts regardless of the assent of the parties only when those laws affect the validity, construction, and enforcement of contracts."  Romein, 503 U.S. at 189.  The Association's statutory obligation to guaranty the insurance coverage of residents protected by the Act

10

does not in any way affect the validity, construction, or enforcement of ELIC's obligation on the GICs. Moreover, there is no evidence that the GICs were created in pursuance of the statutory obligation. Cf. Coombes v. Getz, 285 U.S. 434, 442, 448 (1932) (upholding the contractual liability created pursuant to a state constitutional rule of law that was repealed). The 1992 amendment merely altered definitions under the Act, which in turn affect the Association's statutory obligation to the Honeywell trustee, but the amendment did not alter or affect any bargained-for agreement between the Association and the Honeywell trustee. The Contract Clause does not "protect against all changes in legislation, regardless of the effect of those changes on bargained-for agreements." Romein, 503 U.S. at 190.

We conclude that the Association's obligations are statutory in nature rather than contractual. Absent the existence of a contractual relationship, our Contract Clause inquiry is finished. Accordingly, we affirm the district court's conclusion that the 1992 amendment did not unconstitutionally impair a contractual relationship in violation of the Contract Clause.

## B. DUE PROCESS

Honeywell's due process claim presents a closer question. Honeywell argues that retroactive application of the 1992 amendment defeats its vested right to payment under the Act, in violation of the Due Process Clause. Honeywell relies on Coombes, 285 U.S. at 439-48, where the Supreme Court held unconstitutional the repeal of a California state constitutional provision that provided a cause of action against corporate directors. The Court stated in absolute terms that "neither vested property rights nor the obligation of contracts of third persons may be destroyed or

11

impaired." <u>Id.</u> at 442. More specifically, the Court in <u>Coombes</u> held, "a contractual obligation arose; and the right to enforce it, having become vested, comes within the protection of both the contract impairment clause in Art. 1, § 10, and the due process of law clause in the Fourteenth Amendment, of the Federal Constitution." <u>Id.</u> at 448. Honeywell also relies on <u>Ettor v. City of Tacoma</u>, 228 U.S. 148, 158 (1913), where the Supreme Court held that a statutory right to compensation for property damage caused by the city in the course of grading streets, which right to compensation was complete before a repeal of the cause of action, was a vested property right that could not be retroactively destroyed. Claiming that these cases control the outcome of the case at hand, the Honeywell trustee asserts a vested right to payment under the Act as it existed when ELIC became insolvent, prior to the 1992 amendment.

The Association, on the other hand, urges us to follow more recent Supreme Court precedents in which the Court reviews economic legislation with a very deferential eye and does not accord vested rights status to economic rights. The Association observes that under this modern approach, due process is satisfied as long as a reasonable legislative purpose supports the retroactive application of the legislation. The Association contends that the retroactive 1992 amendment is supported by a reasonable legislative purpose, and alternatively, that no vested rights accrued in favor of the Honeywell trustee upon ELIC's insolvency.

In one sense, both arguments are right. The Supreme Court has never expressly overruled the reasoning of <u>Ettor</u> and <u>Coombes</u>, which accords great protection to accrued statutory causes of action. In the area of economic legislation, however, we cannot ignore the abundance of cases where substantive due process has evolved into a deferential rational basis analysis. We believe that an

12

understanding of the historical context of Ettor and Coombes is essential to divine accurately the present weight of their authority on the issue before us. See Hammond v. United States, 786 F.2d 8, 11 (1st Cir. 1986) (questioning the continued vitality of Coombes and Ettor because recent cases have retroactively abridged economic and real property rights without always carefully distinguishing these prior cases). See also W. David Slawson, Constitutional and Legislative Considerations in Retroactive Lawmaking, 48 Cal. L. Rev. 216, 232 (1960) ("The decision [of Coombes v. Getz] seems far too rigid in its conception of permissible legislative change and would almost certainly not be followed today.").

Ettor and Coombes were decided during what is referred to in the history of American jurisprudence as the Lochner era, named for the pivotal case of judicial activism, Lochner v. New York, 198 U.S. 45 (1905) (invalidating maximum work hours legislation as an unconstitutional exercise of police power). Cases of that era frequently invalidated statutes that limited economic autonomy in a manner thought by the Court to be unnecessary or unwise, but in more recent decisions, the Court plainly sees its role differently: "[W]e do not sit as a super legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare." Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 423 (1952). The reasoning prevalent during the "Lochner [era] has been implicitly rejected many times." Whalen v. Roe, 429 U.S. 589, 597 & n.18 (1977). See also United States v. Carlton, 512 U.S. 26, 114 S. Ct. 2018, 2023-24 (1994) (recognizing that three tax cases from the Lochner era "were decided during an era characterized by exacting review of economic legislation under an approach that `has long since been discarded'" (citation omitted)); Planned Parenthood of S.E. Pa. v. Casey, 505 U.S. 833,

13

861 (1992) (recognizing that the demise of <u>Lochner</u> era reasoning began in <u>West Coast Hotel Co. v. Parrish</u>, 300 U.S. 379 (1937)).

Within two years of the <u>Coombes</u> decision, substantive due process analysis in the area of retroactive economic legislation began to be framed in terms of reasonableness, drifting away from the <u>Lochner</u> era's strict protection of economic freedom and vested rights. <u>See</u> <u>Blaisdell</u>, 290 U.S. at 438 (upholding as an emergency measure a mortgage moratorium law that impaired obligations on mortgage contracts). The Court acknowledged that even the expressly protected obligation of contracts (and similarly, we believe, the concept of vested rights) may be impaired by economic legislation if "the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end." <u>Id.</u> This rational basis substantive due process test appears to have supplanted the legislatively restrictive vested rights mode of analysis, and allows legislatures more freedom in dealing with economic situations. <u>See, e.g.</u>, James L. Kainen, <u>The Historical Framework for Reviving Constitutional Protection for Property and Contract Rights</u>, 79 Cornell L. Rev. 87, 119 (Nov. 1993) ("Modern jurists reject the categorical logic of vesting and consider the statute's justifications under the rubric of substantive due process."); Charles B. Hochman, <u>The Supreme Court and the Constitutionality of Retroactive Legislation</u>, 73 Harv. L. Rev. 692, 696-97 (1959-60) (noting that the vested rights analysis has been replaced by balancing three factors: (1) the nature and strength of the public interest served by the statute, (2) the extent to which the statute modifies or abrogates a preenactment right, and (3) the nature of the right altered by the statute).

In 1976, the Court announced, "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of

14

constitutionality, and that the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976). These authorities leave no doubt that, even though Coombes and Ettor have never been overruled by the Supreme Court, the modern framework for substantive due process analysis concerning economic legislation requires only an inquiry into whether the legislation is reasonably related to a legitimate governmental purpose. Given the criticism surrounding the Court's Lochner era decisions in general, coupled with the development of judicial deference to economic legislation since then, we join those who question the continued validity of the vested rights analysis of Coombes and Ettor when reviewing the constitutionality of economic legislation, recognizing as we must that only the Supreme Court itself can overrule its precedents. We rely instead on the more recent Supreme Court pronouncements of substantive due process analysis for economic legislation, which articulate a rational basis test.

Our task, then, is to determine whether the retroactive application of the 1992 amendment is justified by a rational legislative purpose, or whether it is illegitimate and arbitrary. Retroactive legislation, like prospective legislation, must meet the reasonableness test of due process. Usery, 428 U.S. at 17. "But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." Pension Benefit Guar. Corp. v. R. A. Gray & Co., 467 U.S. 717, 730 (1984). Retroactive economic legislation has been upheld as reasonable even in circumstances where it destroys a settled expectancy or imposes a new liability. See, e.g., Carlton, 114 S. Ct. at 2022-23 (upholding a curative measure that took away an expected and relied upon deduction for estate tax); Gray, 467 U.S. at 734 (upholding retroactive application of

ERISA's withdrawal liability as supported by rational legislative purpose); <u>Usery</u>, 428 U.S. at 19-20 (upholding retroactive aspects of Black Lung Benefits Act of 1972, which required employers to compensate former employees disabled by a work-related disease). The Court has repeatedly noted that although certain economic liabilities or burdens were not anticipated, nevertheless, "`"our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations."'" <u>Concrete Pipe & Prod. v. Constr. Laborers Pension Trust</u>, 113 S. Ct. 2264, 2287 (1993) (quoting <u>Gray</u>, 467 U.S. at 729, quoting <u>Usery</u>, 428 U.S. at 16).

Using these standards, we conclude that the 1992 amendment redefining "contractual obligation" was neither arbitrary nor illegitimate. The state has a legitimate interest in regulating the insurance industry, easing the economic burdens of its own residents, and ensuring the economic life of an association created by its statute to protect its residents. The general purpose of the Act at issue in this case "is to protect the future financial stability of individuals," <u>Minnesota Life & Health Ins.</u>, 400 N.W.2d at 773, and the preamendment Act expressly provided protection to "residents" to whom "contractual obligations" are owed. Minn. Stat. § 61B.06, subd. 2 (1986). The 1992 amendment serves to narrow the definition of contractual obligation, explicitly providing coverage only to resident plan participants. This is a legitimate purpose.

The 1992 amendment is also curative in nature, even though it worked a substantive change in the law. <u>See</u> <u>Honeywell</u>, 518 N.W.2d at 560-63 (holding that the amendment worked a substantive change in the law because before the amendment, it plainly entitled resident policy owners, including trustees, to coverage). Curative legislation corrects an unintended and unanticipated mistake in the

underlying legislation, which went undetected until some time after the original enactment. Certainly, legislatures have the authority to cure inadvertent defects in their legislation. See Carlton, 114 S. Ct. at 2022 (upholding Congress's attempt to cure a defect in the tax code). In Carlton, the Court concluded that Congress's purpose in retroactively taking away an estate tax deduction, even though the decedent's executor had relied upon it, was neither illegitimate nor arbitrary because "Congress acted to correct what it reasonably viewed as a mistake in the original 1986 provision that would have created a significant and unanticipated revenue loss." 114 S. Ct. at 2023. We also note the observation of one commentator that "the individual who claims that a vested right has arisen from the defect is seeking a windfall since, had the legislature's . . . action had the effect it was intended to and could have had, no such right would have arisen." Hochman, supra at 705.

Here, the Minnesota legislature acted reasonably when it gave retroactive effect to the 1992 amendment in order to cure a drafting defect that might have inadvertently left thousands of Minnesota residents without coverage under the Act due to the ELIC debacle. We agree with the observation of the Supreme Court of Minnesota: "Given that unallocated annuity contracts were not prevalent at the time of the statute's enactment in 1977, the legislature likely did not contemplate how the Act specifically applied to these contracts." Honeywell, 518 N.W.2d at 561. Absent retroactive effect, an unintended gap in coverage would have left many Minnesota resident workers (whose trustee resided elsewhere) without coverage, while an unintended windfall in favor of nonresident workers who had a Minnesota trustee would have strained the financial capabilities of the Association and required Minnesota residents to pay higher premiums to finance the Association's obligation to out-of-state residents. In sum, "the

17

interest in the retroactive curing of such a defect in the administration of government outweighs the individual [trustee's] interest in benefiting from the defect." Hochman, supra at 705-06. Thus, we conclude that retroactive application of the 1992 amendment was a rational means by which to accomplish the state's legitimate goals.

Honeywell contends that retroactive application is arbitrary and irrational because there is no connection linking the Honeywell trustee to the ELIC failure that triggered coverage and because the amendment has a disparate impact on non-residents. Neither contention has merit. We have already determined that the retroactive application of the amendment was rational and prevented an unanticipated gap in coverage for resident plan participants and an unexpected windfall for nonresident plan participants. Because the context here is curative in nature, there is no need to demonstrate any connection of the Honeywell trustee to the ELIC failure in order for the legislation to be rational. We agree with the Association's contention that the amendment actually eliminates the arbitrary aspect of the prior legislation under which Minnesota residents may or may not have had coverage for their plan funds, depending solely upon the arbitrary residence of their plan trustee, over which they have no control. Additionally, the disparate impact results only from the state's legitimate interest in maintaining the welfare of its own citizens, not from arbitrariness or discrimination. Retroactive application does not deprive nonresidents of any rights (except the expectation of coverage based on the arbitrary residence of their trustee), and it does not place any added burdens or liabilities on nonresidents.

To the extent Honeywell argues that this case is fully controlled by Coombes and Ettor, we also disagree. As already noted, we question the continued vitality of these cases.

18

Furthermore, even assuming they remain authoritative, we conclude that they do not control the outcome in this situation. In our view, Ettor and Coombes do not stand for the proposition that an inviolable vested right exists whenever a statutory economic right accrues. In Coombes, the Court expressly protected what had become a vested contract right, independent of the statute. 285 U.S. at 448. We have previously concluded that no contract rights are implicated by the 1992 amendment. This case involves legislation of economic matters which exist only by statute and have not been integrated into a private contract, and Honeywell did not even make choices in reliance on the preamendment Act. In Ettor, the Court protected a cause of action that provided a remedy for property damage to private property that occurred while the city graded streets for public use. 228 U.S. at 156. In the present case, neither the state nor the Association caused a harm and then took away a remedy for the injury caused, as the city and state did in Ettor.

In sum, Coombes and Ettor are not directly applicable to the case at hand because each involves an element distinguishable from the type of economic legislation at issue here. Thus, even if Coombes and Ettor apply, they do not dictate a conclusion that accrued economic rights under the preamendment Act rise to the level of a vested right. Rather, in spite of the expectancies that may have been based upon the preamendment Act, the retroactive 1992 amendment was a rational means by which to accomplish the legitimate economic goal of ensuring the welfare of Minnesota resident workers.

### III.  CONCLUSION

Finding no violation of either the Contract Clause or the Due Process Clause through retroactive application of the 1992 amendment, we affirm the judgment of the district court.

LOKEN, Circuit Judge, with whom BOWMAN, Circuit Judge, joins, concurring.

I concur in Part II.B. of the court's opinion, concluding that the Minnesota statute at issue does not violate Honeywell's right to substantive due process, except to the extent that the rollover paragraph on pages 18 and 19 is inconsistent with my view of the Contract Clause issue.  As to that issue, I respectfully disagree with the court's conclusion that no contract has been impaired, but I agree that there has been no *unconstitutional* impairment.  Accordingly, I concur in the court's decision to affirm.

As the court explains, the modern Contract Clause analysis is (1) has the State impaired a contract, (2) is the impairment substantial, and (3) is the statute nevertheless a permissible exercise of the State's police power.  See General Motors v. Romein, 503 U.S. 181, 186 (1992); Energy Reserves, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410 (1983).  The latter two factors are interrelated.  "The severity of the impairment measures the height of the hurdle the state legislation must clear." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245 (1978).

1. Was There a Contract.  My starting point on this question is Coombes v. Getz, 285 U.S. 434, 440-42 (1932), in which California repealed a constitutional provision holding corporate directors personally liable to creditors for embezzled or misappropriated corporate funds.  In holding that the repeal

20

unconstitutionally impaired a creditor's contract with a corporation, the Court described the repealed liability as "in its nature contractual." Justice Cardozo in dissent observed that to call the liability contractual was "a legal fiction . . . borrowed from the law of quasi contracts." But he nonetheless agreed that the Contract Clause may protect a creditor's "contract with a corporation secured in certain contingencies by a statutory liability."

To me, Coombes confirms that a statute may create a contract between private parties that the Contract Clause protects. See also Steamship Co. v. Joliffe, 69 U.S. 450, 456-57 (1864) (statute created contract between shipping company and harbor pilots); Hawthorne v. Calef, 69 U.S. 10, 22 (1864) (statute providing that stock is security for railroad's creditors created contract between creditors and shareholders). All recent Supreme Court cases analyzing whether a statute had created a contract for Contract Clause purposes dealt with obligations of the State, rather than, as in Coombes, obligations the State has compelled private parties to assume. But that should not alter the analysis. For example, even if a statute mandates the terms of a fire insurance policy, the policy is still a contract. Accord In re Workers' Compensation Refund, 46 F.3d 813, 818 (8th Cir. 1995).

In this case, the statute created the Guaranty Association, a private non-profit entity consisting of all insurers wishing to do business in the State, and required that entity to guarantee the "covered policies" of its members in the event of an insolvency. That third party guaranty looks much like the statutory liability in Coombes. "In determining whether a particular statute gives rise to a contractual obligation, it is of first importance to examine the language of the statute." National R.R. Passenger Corp. v. Atchison, Topeka & S.F. Ry., 470 U.S. 451, 466 (1985).

Here, the statute uses the word "guaranty" in its title and provides that the Association "shall . . . guarantee, assume, or reinsure" the obligations of its members. Minn. Stat. § 61B.06, subd. 1 (1986). A guaranty is a contract under Minnesota law. See Baker v. Citizens State Bank of St. Louis Park, 349 N.W.2d 552, 557-58 (Minn. 1984). In these circumstances, Honeywell has had a "contract" impaired, either its underlying investment contracts with ELIC or, more directly, the guaranty by the Guaranty Association. The contrary conclusion of the Minnesota Supreme Court, though entitled to deference in its construction of state law, is not binding on us for Contract Clause purposes. See Romein, 503 U.S. at 187.

2. Was the Contract Substantially Impaired. Total destruction of a contract is a substantial impairment. Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 431 (1934). At first glance, this case seems to involve total destruction of the guaranty rights of non-resident Honeywell employees. But that ignores the nature of the guaranteed contracts. As a GIC trade association monograph explained, "GICs are assets of the pension plan. Individual employees do not own any part of a GIC, nor do employees have any individual rights under the contract." Thus, properly viewed, the impairment is partial -- a reduction in the Association's guaranty obligation to the Honeywell Plan. (Whether that loss to the Plan must ultimately be borne only by non-resident beneficiaries is an issue not before us.)

Though partial, the impairment is quantitatively substantial -- based on the percentage of non-resident Honeywell employees, the statutory amendment deprived the Plan of some 75% of its guaranty claim against the Association. In addition, the impairment was not merely incidental to another legislative purpose; the statute was

22

enacted to impair.  Compare Energy Reserves, 459 U.S. at 418; Exxon v. Eagerton, 462 U.S. 176, 194 n.14 (1983).

Beyond the sheer magnitude of an impairment, the Supreme Court looks at whether the impaired term was central to the contract, whether settled expectations have been disrupted, and whether the impaired right was reasonably relied on.  See El Paso v. Simmons, 379 U.S. 497, 514 (1965); Spannaus, 438 U.S. at 243 n.14.  In general, when an industry is heavily regulated, parties are considered to have less reasonable expectation that legislation will not alter their contractual arrangements.  See Energy Reserves, 459 U.S. at 411.  These other factors cut against the substantiality of this impairment.  As in Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark, 310 U.S. 32, 38 (1940), the industry is both heavily regulated and "regulated in the particular to which [Honeywell] now objects," since the State created the impaired guaranty.  Honeywell cannot show substantial reliance on the Association's guaranty when it purchased the GICs in 1988 because the Association has broad power to unilaterally impose conditions on its guaranty obligations, subject to the Commissioner's approval, including the power to declare a moratorium on payments.  See Minn. Stat. § 61B.06, subds. 1-3 (1986); Honeywell v. Minnesota Life & Health Ins. Guar. Ass'n, 518 N.W.2d 557, 563 (Minn. 1994).

On the other hand, recent Eighth Circuit cases have looked unfavorably on retroactive legislation impairing contracts, even in heavily regulated industries.  See Workers' Compensation Refund, 46 F.3d at 820 (statute confiscating excess reinsurance premiums invalid though reinsurance plan documents incorporated changes in state law); Holiday Inns Franchising, Inc. v. Branstad, 29 F.3d 383, 384 (8th Cir.), (statute retroactively restricting franchisor termination rights invalid), cert. denied, 115 S. Ct. 613 (1994); Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dept.

of Public Welfare, 742 F.2d 442, 451 (8th Cir. 1984) (statute retroactively reducing nursing home rates for medicaid patients invalid "because it disrupts settled and completed financial arrangements under contracts made in reliance on existing law"), cert. denied, 469 U.S. 1215 (1985).

On balance, I conclude this impairment is substantial. Honeywell lost 75% of its guaranty benefit. Cf. Spannaus, 438 U.S. at 247 (statute imposing $185,000 pension charge on employer closing state office was substantial impairment). Thus, on the sliding scale the Supreme Court uses for the last two Contract Clause factors, this impairment requires close scrutiny of the State's justification.

3. Is the Substantial Impairment Justified. The economic interests of a state may justify its impairing contracts, see, e.g., Blaisdell, 290 U.S. at 437, but the Contract Clause imposes limits on that power. "Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 22 (1977). Given the deference paid to state legislatures, especially when the State is not a party to the impaired contract, most claims founder on this aspect of the modern Contract Clause analysis. The Supreme Court looks hard at whether there is a legitimate public purpose and then defers to the legislative judgment as to the reasonableness of a particular remedy. See Energy Reserves, 459 U.S at 412-13.

Of particular importance in this case, the Court has stated that it is reasonable to amend a statute to eliminate unforeseen consequences or windfall benefits, even if that impairs existing contracts. See U.S. Trust, 431 U.S. at 31 & n.30; Energy Reserves,

459 U.S. at 412. For example, the Court in U.S. Trust explained that the amendment in El Paso was valid because it simply limited parties "to those gains reasonably to be expected from the [original] contract." Conversely, the amendment struck down in U.S. Trust was not in response to windfall benefits or unforeseen consequences because it repealed a provision expressly prohibiting the use of Port Authority revenues for transportation subsidies.

In this case, the Minnesota Legislature based its initial 1977 statute on the NAIC Model Life & Health Guaranty Association Act. The Model Act at that time provided that the association must guarantee all obligations of an insolvent *domestic* insurer. For an insolvent foreign or out-of-state insurer, however, the association only guaranteed "the covered policies of residents," and it would have "no liability" if that insurer's home State provided "substantially similar" protection "for residents of other states." See Minn. Stat. § 61B.06, subds. 2 and 4 (1986). In other words, if every State had enacted this Model Act and uniformly applied it, the association in an insolvent U.S. insurer's home State would pay all guaranty claims. But if an offshore insurer grabbed everyone's money and went under, each State's association would guarantee the covered policies of that State's residents.

In this environment, Honeywell's guaranty claim for its investment in ELIC GICs posed a substantial unforeseen consequence in Minnesota for three reasons. First, the legislators who enacted the initial Minnesota statute in 1977 did not foresee that, unlike regulators in most every other State, Minnesota's Commissioner would take the position in the 1980s, before ELIC became insolvent, that GICs are "covered policies," and the Supreme Court of Minnesota would agree in Minnesota Life & Health Guar. Ass'n v. Department of Commerce, 400 N.W.2d 769, 773-74 (1987). As a result

25

of this lack of uniform implementation, when Honeywell sent its ELIC claims to all fifty States, it received blanket denials from most everyone except Minnesota.

Second, the Legislature did not foresee that "covered policies" would include group annuities in which a single contract holder, rather than thousands of beneficiaries, is the "resident." One can argue that this issue was reasonably foreseeable. But I see no indication that even the drafters of the various Model Acts anticipated the problem before 1985. That the issue was unforeseen is confirmed by the fact that any careful drafter familiar with ERISA insurance-funded group life and health plans would not try to solve this complex an issue with the single word "resident."

Third, Honeywell took the position that the $300,000 statutory ceiling on the Association's liability "for all benefits . . . with respect to any one life," Minn. Stat. § 61B.06, subd. 8 (1986), does not apply to its GIC claims. That exposed the Association to a $111,000,000 claim, far more than any State has allowed in *expressly* covering GICs. See Minn. Stat. § 61B.19, subd. 4(6) (1996) ($7,500,000 limit on claims regarding "unallocated annuities of a retirement plan"); 1985 NAIC Model Act § 3(c)(2)(B) ($5,000,000 limit).

Faced with this surprising confluence of factors that produced a genuinely unforeseen consequence and arguable windfall benefit, the Legislature enacted an amendment that reduced the Association's statutory guaranty to a level that Honeywell (or any other plan sponsor) should reasonably have expected from the statute as originally enacted: because GICs are not "covered policies" in California, ELIC's home State, the Minnesota Association must guarantee ELIC's GIC obligations to Minnesota residents; therefore,

the Honeywell Plan is entitled to a guaranty benefit equal to that portion of its GIC contracts that represent investments on behalf of its Minnesota resident beneficiaries.

In enacting this amendment, the State acted in furtherance of the legitimate economic interests of its citizens.[3] The effect of its action was to reduce a state-mandated private benefit in a manner not inconsistent with the reasonable expectations of the parties to that "contract." In these circumstances, I concur in the court's conclusion that Minnesota did not unconstitutionally impair the Contract Clause rights of the Honeywell Plan trustee or the Plan's ultimate employee beneficiaries.

RICHARD S. ARNOLD, Chief Judge, with whom McMILLIAN, MAGILL, BEAM, and MORRIS SHEPPARD ARNOLD, Circuit Judges, join, dissenting.

I agree with Judge Loken that a contract was impaired by the Minnesota Legislature's amendment of section 61B. I also believe that impairment was substantial within the meaning of the Contracts Clause, and not sufficiently justified. I therefore respectfully dissent.

The lead opinion holds that there was no contract to be impaired when the Minnesota Legislature amended § 61B to exclude out-of-state-resident life-insurance policyholders and other beneficiaries from its coverage. As Judge Loken's opinion

---

[3]As the court observes in its substantive due process discussion, because the Association's liabilities are unfunded -- claims are paid by post-insolvency assessments of the remaining, solvent members -- it does not take a team of actuaries to deduce that if Minnesota compels the Association to bestow uniquely generous guaranty benefits on the non-Minnesota customers of this year's insolvent insurer, ELIC, the Association's members must eventually recoup those benefits by imposing higher insurance premiums on future Minnesota policyholders.

explains, it is settled law that obligations between private parties which are mandated by statute may nonetheless be contractual and enforceable as such.  The statute which created the Minnesota Life and Health Insurance Guaranty Association states that the Association was created to protect the rights of policyowners and other beneficiaries by guaranteeing the obligations owed them by insurance companies.  Minn. Stat. § 61B.02 subd. 2 (1990) ("The purpose of sections 61B.01 to 61B.16, is to protect policyowners, death benefit certificate holders, insureds, beneficiaries, annuitants, payees, and assignees of life insurance policies, health insurance policies, annuity contracts and supplemental contracts . . ..").  The duty to guarantee the obligations of member insurance companies appears to be the Association's primary reason for existence.  The power to collect assessments from member companies exists to enable the Association to fulfill that duty.  A guaranty is itself a kind of contract, an undertaking to fulfill the obligation of another if that other is in default.

It seems improbable that the Legislature would create a separate, nonprofit legal entity and endow it with the power to collect assessments from member insurance companies without demanding reciprocal performance from the Association.  The words of the statute belie such a possibility: "If a domestic insurer is an impaired insurer [unable to meet its obligations to  policyholders and other beneficiaries], the association shall . . . guarantee, assume, or reinsure, or cause to be guaranteed, assumed, or reinsured, the covered policies of the impaired insurer . . .."

Minn. Stat. 61B.06 subd. 1(b); see also § 61B.06 subd. 2 (pertaining to foreign insurers).  The lead opinion today holds the Association did not owe a contractual duty to guarantee all covered policies because a legislature must exhibit a clear indication that it intends to bind itself contractually before it will be considered to be so bound.  The Legislature in the instant case did not bind itself, however; it bound the Association. The Legislature created the Association to collect membership fees from insurance companies and to assume the obligations of those companies should they become "impaired."   I therefore agree with Judge Loken that the obligations owed by the Association, even though their origin is in the statute, are nonetheless contractual and not merely "statutory."

It follows that the Minnesota Legislature's amendment of the statute was an impairment of a contract.  Two sets of contractual relationships were impaired by the Legislature's action:  that between Honeywell's trustee and the Association, and that between the trustee and ELIC.  The former is affected because the Association, under the amended statute, is released from most of its duty to guarantee the obligation owed the trustee.  The latter is affected because the trustee contracted with ELIC under the prior version of the statute, and consequently under the assumption that the GICs were fully guaranteed by the Association.

Judge Loken's concurring opinion concludes that there was only a partial destruction of the contract in this case, because the amendment merely diminished the Association's obligation to guarantee the GICs, rather than destroying that obligation completely.  As Judge Loken recognizes, a substantial impairment need not be a total destruction to violate the Contracts Clause.  I agree that the impairment in this case was substantial.  Indeed, the Minnesota Legislature chose which investments to protect and

29

which to abandon at the level of the individual, according to the individual's state of residence. It specifically intended to abrogate the Association's duty to guarantee a given obligation based on the individual investor to whom that duty was owed. It therefore seems appropriate to view the Legislature's action as a complete destruction of those individual contractual relationships.

The Supreme Court has held that the Constitution does not prevent a legislature from working a substantive change in the law, and impairing contracts thereby, as long as it had sufficient justification for doing so. "[L]egislation adjusting the rights and responsibilities of contracting parties" will not violate the Contracts Clause if it is created "upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." Allied Structural Steel v. Spannaus, 438 U.S. 234, 244 (1978) (internal quotation omitted).

One possible justification for the amendment could be to avoid unforeseen consequences or windfall benefits. Under that view, the Legislature could not have foreseen that Minnesota's Association would be the only one which guaranteed GICs as "covered policies." To the contrary, it was not only foreseeable, but readily ascertainable, that other states did not treat GICs the way Minnesota did. Minnesota's Commissioner and its State Supreme Court both came to that conclusion in the 1980s.

Minnesota also, it is argued, could not have intended to guarantee coverage of policies based simply on the residence of a trustee. The coverage mandated by such a rule, the argument continues, is far more expansive than the Legislature could have anticipated. Perhaps the Legislature did not anticipate that the Association would incur such a large obligation. But it should have; the language of the statute is not so ambiguous that such a

30

reading should be surprising. Under the subdivision which applies to out-of-state impaired insurers, the statute requires the Association to "guarantee, assume, or reinsure or cause to be guaranteed, assumed, or reinsured, the covered policies of residents, and shall make or cause to be made prompt payment of the impaired insurer's contractual obligations which are due and owing to residents." Minn. Stat. § 61B.06 subd. 2. It was clear when Honeywell applied for coverage of its ELIC GICs that GICs were already "covered policies" in Minnesota. The ambiguity is allegedly whether "residents" could foreseeably have included a trustee which held several "covered policies" on behalf of both resident and non-resident beneficiaries. The statute defines "resident" in § 61B.03: "'Resident' means any person who resides in this state at the time the impairment is determined and to whom contractual obligations are owed." "Person," according to the statute, "means any individual, corporation, partnership, association or voluntary organization." Minn. Stat. § 61B.03 subd. 12-13. The drafters should have realized that individual corporations, partnerships, associations, and voluntary organizations could hold numerous covered policies on behalf of employees or other beneficiaries. I therefore cannot agree that the Legislature's amendment of the statute is justified because of unforeseeable consequences.

That the amendment imposed a retroactive change raises the "hurdle" the state must clear in order to justify a substantial impairment of contracts. Legislation which makes prospective changes affecting private contracts is an appropriate and commonplace legislative function; private contracting parties, especially in regulated industries, should expect that laws and regulations may change and affect their future dealings. We examine the state's justification for retroactive changes more carefully because the opposite is generally true: private

contracting parties should and do expect that the conditions under which they contracted will remain in effect unless and until there is a change. They do not normally expect lawmakers to change the basic assumptions underlying those agreements so as to affect legal obligations incurred, or rights vested, in the past. See <u>Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Works</u>, 742 F.2d 442, 450-51 (8th Cir. 1984) (upholding prospective change but striking down retroactive change because it "disrupt[ed] settled and completed financial arrangements under contracts made in reliance on existing law"), <u>cert. denied</u>, 469 U.S. 1215 (1985); <u>Holiday Inns Franchising, Inc. v. Branstad</u>, 29 F.3d 383, 385 (8th Cir.) (observing that retroactive changes which alter prior contractual relationships have "almost uniformly been declared unconstitutional," and that "this is a datum on which [parties] are presumably allowed to rely while bargaining"), <u>cert. denied</u>, 115 S. Ct. 613 (1994).

The Minnesota Legislature in this case deliberately effected a retroactive change in the law to allow the Association to avoid a $110 million payout. The Minnesota Supreme Court has held that the Legislature's amendment was a change, and not a clarification of the statute. <u>Honeywell, Inc. v. Minnesota Life & Health Ins. Guar. Ass'n</u>, 518 N.W.2d 557, 562 (Minn. 1994). The Legislature's action was a deliberate, retroactive change in the law which altered the settled contractual duties of the Association, and greatly impaired Honeywell's right to payment. The size of the payout, while substantial, does not seem to me to provide sufficient justification for the change. Indeed, the large size of the payout serves only to underscore the substantiality of the obligation that the Legislature has nullified.

Many reasons underlay the determination of the Framers to create a new Constitution. Perhaps none was more prominent than

their conviction that States should not be allowed to destroy or water down contracts for the payment of money. The Contracts Clause "was perhaps the strongest single constitutional check on state legislation during our early years as a Nation . . .." <u>Allied Structural Steel Co. v. Spannaus</u>, <u>supra</u>, 438 U.S. at 241 (footnote omitted). I regret that this Court today shrinks from enforcing this part of the Constitution, which is designed to safeguard a basic human right, the right to make private contracts. It is not a coincidence that most of the people injured by this statute cannot vote for the Minnesota Legislature.

I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.